UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

A&E TELEVISION NETWORKS, LLC
and D&D TELEVISION PRODUCTIONS,
INC.,

                Interpleader
                Plaintiffs,

      v.

PIVOT POINT ENTERTAINMENT, LLC,
DUANE CHAPMAN, and ALICE
BARMORE-SMITH CHAPMAN,

                Defendants.

10 Civ. 9422 (PGG)

**MEMORANDUM
OPINION & ORDER**

PAUL G. GARDEPHE, U.S.D.J.:

        On December 17, 2010, Plaintiffs A&E Television Networks, LLC and D&D Television Productions, Inc. filed this interpleader action seeking authorization to deposit certain monies into the Court's registry claimed by Defendants Pivot Point Entertainment, LLC ("Pivot Point"), and Duane and Alice Barmore-Smith Chapman. Plaintiffs also request that Defendants be enjoined from prosecuting any action against Plaintiffs for recovery of these monies. On December 17, 2010, this Court entered an Order to Show Cause directing Defendants to demonstrate why interpleader relief should not be granted.

        Pivot Point opposes the interpleader action, alleging that it was brought by Plaintiffs "in concert with the Chapmans . . . to stall adjudication of [Plaintiffs'] obligation to pay Pivot." (Pivot Dec. 28, 2010 Br. 2) The Chapmans do not object to the interpleader action, but request that any order granting Plaintiffs' application "not insulate Plaintiffs from liability" for entering into what the Chapmans allege is an illegal agreement with Pivot Point. (Chapman Dec.

22, 2010 Br. 2-3) On January 5, 2011, the Court conducted a hearing to address the issues raised in the parties' submissions.

For the reasons stated below, this interpleader action will be permitted to proceed.

## **BACKGROUND**

A&E broadcasts "Dog the Bounty Hunter," a television program starring Duane "Dog" Chapman and his wife Alice Barmore-Smith ("Beth") Chapman (the "Program"). (Houts Decl. Ex. C)  In December 2003, Boris Krutonog and Hybrid Films, Inc. entered into a co-producer agreement for the Program under which Hybrid was to pay Krutonog fees for each episode. (Id. at ¶ 3)  Hybrid Films and Krutonog each created a special purpose corporate entity for the purpose of producing the Program – Hybrid created D&D, and Krutonog created Pivot Point. (Id. at Ex. A)

In December 2005, Pivot Point, D&D, and A&E entered into an agreement (the "Pivot Point Agreement" or "Agreement") under which the two co-producers (Krutonog and Hybrid) each assigned all of their rights to Pivot Point and D&D, respectively. (Id.)  A&E's responsibilities under the Agreement are to render accountings and pay Pivot Point royalties for any video distribution and broadcasts of the Program on other networks. (Id.)

Pivot Point now claims that it is entitled to certain royalties and fees under the Pivot Point Agreement. The Chapmans, however, claim that the Pivot Point Agreement violates the California Talent Agencies Act ("TAA") and that they, and not Pivot Point, are entitled to the royalties and fees due under the Agreement.

This is the fourth lawsuit arising out of the parties' disputes concerning the Pivot Point Agreement. On March 23, 2007, the Chapmans commenced an administrative proceeding against Krutonog and Pivot Point before the California Labor Commissioner. In that action, the

2

Chapmans seek an order declaring that the Pivot Point Agreement, and a "Life Rights Agreement" between the Chapmans and Krutonog, violate the TAA, and declaring that any amounts due under the Agreement should be paid to the Chapmans. (Id. at Ex. C)  In a June 1, 2007 letter to A&E and D&D, the Chapmans' counsel directed Plaintiffs to "immediately cease and desist paying any further sums to Boris Krutonog or Pivot Point Entertainment in connection with the Program," and warned Plaintiffs that the Chapmans "intend to hold you fully responsible for damages . . . from any future payments to these entities." (Id. at Ex. B)  The California Labor Commissioner has not yet issued a decision as to whether the Agreement violates the TAA.

After the filing of the California administrative proceeding and receipt of the Chapmans' letter, A&E and D&D informed Krutonog and Pivot Point that they would hold in escrow any amounts due under the Agreement. (Id. ¶ 7)  On May 19, 2008, Krutonog and Pivot Point commenced an action against A&E and D&D in the Supreme Court for the State of New York, New York County (the "New York Action")[1] seeking damages for breach of the Agreement and a declaration that the Agreement is valid and that they are entitled to fees and royalties due under the Agreement. (Edel Decl. ¶ 7)  A&E and D&D moved to dismiss or stay the New York Action pending the outcome of the California administrative proceeding, but on June 8, 2010, those motions were denied.  Pivot Point's claim for declaratory relief was dismissed, however, because the court found that "the validity of the agreement is before . . . the California board and is not clearly before me." (Id. Ex. C at 9)

Asserting that they were "at risk of inconsistent judgments" – "[a] determination by the California Labor Commissioner that the Pivot Point Agreement is invalid under the TAA

---

[1] Pivot Point Entertainment, LLC v. Hybrid Films, Inc, Index No. 601516/2008 (N.Y. Sup. Ct. 2008).

3

and a determination in the New York Action enforcing the Pivot Point Agreement in favor of Pivot Point" (id. ¶ 12) – on July 7, 2010, Plaintiffs filed an interpleader action pursuant to 28 U.S.C. § 1335 in the United States District Court for the Central District of California.[2] Plaintiffs sought authorization to deposit the disputed fees and royalties in that court's registry and a discharge from liability.  (Id. ¶¶ 13-14)  On September 27, 2010, Pivot Point moved to dismiss on grounds of improper venue, based on a forum selection clause in the Agreement designating "any court or courts in the state of New York or of the United States of America, in New York County, New York" as the exclusive jurisdiction for "any matter arising under the . . . Agreement."  (Houts Decl. Ex. A, ¶ 9)  Pivot Point's motion was granted on December 10, 2010.  The instant action was then filed in this District on December 17, 2010.

## DISCUSSION

### I.   LEGAL FRAMEWORK

Title 28, United States Code, Section 1335 grants district courts original jurisdiction over interpleader actions in which the amount at stake is $500 or more, and the action presents "[t]wo or more adverse claimants, of diverse citizenship" who are claiming or may claim to be entitled to the money or property at issue.  28 U.S.C. § 1335 (2009).  It is not necessary that the claims "have a common origin, or . . . [be] identical"; the claims need only be "adverse to and independent of one another."  Id.  The statute also requires that the interpleader plaintiff deposit the money or property "into the registry of the court, there to abide the judgment of the court."  Id.

Interpleader is "rooted in equity," and is triggered by a "'real or reasonable fear of double liability or vexatious, conflicting claims.'"  Bank of New York v. First Millennium, Inc.,

---

[2] A&E Television Networks, LLC v. Pivot Point Entertainment, LLC, 2:10-CV-04978(JST) (C.D. Cal. 2010).

607 F.3d 905, 922 (2d Cir. 2010) (quoting Washington Elec. Coop., Inc. v. Paterson, Walke & Pratt, P.C., 985 F.2d 677, 679 (2d Cir. 1993)).  "Historically, a bill of interpleader was an equitable device whose purpose was 'the avoidance of the burden of unnecessary litigation or the risk of loss by the establishment of multiple liability when only a single obligation is owing.'"  Bradley v. Kochenash, 44 F.3d 166, 168 (2d Cir. 1995) (quoting Texas v. Florida, 306 U.S. 398, 412 (1939)).

Interpleader is designed to prevent claimants from racing to the courthouse to obtain a judgment, and thereby obtaining

> a disproportionate slice of the fund before . . . fellow claimants [are] able to establish their claim.  The difficulties such a race to judgment pose for the [stakeholder], and the unfairness which may result to some claimants, were among the principal evils the interpleader device was designed to remedy.

State Farm Fire & Casualty Co. v. Tashire, 386 U.S. 523, 533 (1967).  Interpleader "'insulate[s] a stakeholder from contradictory judgments and multiple liability and . . . relieve[s] a stakeholder from having to determine which claim among several is meritorious.'"  Weininger v. Castro, 462 F. Supp. 2d 457, 500 (S.D.N.Y. 2006) (quoting John v. Sotheby's, Inc., 141 F.R.D. 29, 33 (S.D.N.Y. 1992)).

The Supreme Court and Second Circuit have instructed that the interpleader statute "is remedial and [is] to be liberally construed."  State Farm Fire & Casualty Co., 386 U.S. at 533; see also Ashton v. Paul, 918 F.2d 1065, 1069 (2d Cir. 1990); William Penn Life Ins. Co. of New York v. Viscuso, 569 F. Supp. 2d 355, 359 (S.D.N.Y. 2008).  Moreover, "'the trend both with regard to statutory revision and judicial interpretation, has been directed toward increasing the availability of interpleader and eliminating . . . technical restraints on the device.'"  6247 Atlas Corp. v. Marine Ins. Co., Ltd., 155 F.R.D. 454, 462 (S.D.N.Y. 1994) (quoting 7 Wright et al., Federal Practice and Procedure § 1704 at 500-01 (2d ed. 1986)).

5

## II.   THE REQUIREMENTS FOR INTERPLEADER RELIEF HAVE BEEN MET

Several requirements for interpleader relief are clearly present here. For example, because Pivot Point is a resident of California, and the Chapmans are residents of Hawaii (Cmplt. ¶¶ 4-6), there is diversity between claimants, which satisfies this element under 28 U.S.C. § 1335(a)(1). Moreover, given that Plaintiffs are holding more than $2 million in fees and royalties claimed by Pivot Point and the Chapmans (id. ¶ 37), the $500 amount in controversy requirement is easily satisfied. 28 U.S.C. § 1335(a).

Pivot Point argues, however, that interpleader relief should be denied because (1) Plaintiffs have not demonstrated that they are facing conflicting claims from Pivot Point and the Chapmans, because the Chapmans' claim lacks substance; and (2) venue does not lie in this District. Pivot Point further contends that this Court should abstain in favor of the New York Action, and that Plaintiffs' delay in bringing this action warrants dismissal. For reasons explained below, all of these objections will be overruled.

### A.   Adversity

An interpleader plaintiff must demonstrate that it faces adverse claims to money or property it is holding. 28 U.S.C. § 1335. It is not necessary for an interpleader plaintiff to demonstrate that a particular claimant is likely to prevail; instead, the interpleader plaintiff need only demonstrate that more than one claimant has a claim of substance. See Bank of New York, 607 F.3d at 922 ("The interpleader plaintiff is not required to assess the legal validity of the competing claims against it; interpleader is proper so long as the party requesting it has 'real or reasonable fear of double liability or vexatious, conflicting claims.'" (quoting Paterson, Walke & Pratt, P.C., 985 F.2d at 679)); William Penn Life Ins. Co., 569 F. Supp. 2d at 359 ("a stakeholder 'is not required to evaluate the merits of conflicting claims at its peril; rather, it need only have a

6

good faith concern about duplic[ative] litigation and multiple liability if it responds to the requests of certain claimants and not to others.'" (quoting Sotheby's, Inc. v. Garcia, 802 F. Supp. 1058, 1065 (S.D.N.Y. 1992))); Sotheby's, Inc., 802 F. Supp. at 1065 ("The availability of the interpleader remedy . . . is not dependent on the merits of the claims asserted against the stakeholder.").

For purposes of demonstrating a right to interpleader relief, a plaintiff likewise need not demonstrate that conflicting claims have been filed in court. The mere threat of conflicting claims is sufficient. See, e.g., Sotheby's, Inc., 802 F. Supp. at 1065 ("'The mere threat of future litigation is a sufficient basis for interpleader.'" (quoting A/S Krediit Pank v. Chase Manhattan Bank, 155 F. Supp. 30, 34 (S.D.N.Y. 1957))); see also UBS Int'l, Inc. v. Itete Brasil Instalacoes Telefonicas Ltd., No. 09 Civ. 4286(LAK), 2009 WL 1619915, at *2 (S.D.N.Y. June 4, 2009) ("the existence of competing claims to the same property is not a prerequisite to [interpleader relief]. All that is required is 'a good faith concern about duplic[ative] litigation and multiple liability if [the interpleader] plaintiff responds to the requests of certain plaintiffs and not to others.'" (quoting Sotheby's, Inc., 802 F. Supp. at 1065)). For example, in Sotheby's, Inc. v. Garcia, a letter from one claimant's counsel to Sotheby's (the interpleader plaintiff) – in which the claimant asserted that it was the owner of certain paintings that Sotheby's had consigned to the other claimant – "was a sufficient claim to the Paintings to justify Sotheby's filing of the . . . interpleader action." Sotheby's, Inc., 802 F. Supp. at 1065.

Here, there is no dispute that Pivot Point has a claim of substance against Plaintiffs based on the Pivot Point Agreement. That claim is the basis for the New York Action, in which Pivot Point seeks fees and royalties that it claims it is owed under the Agreement. Pivot

Point argues, however, that "there is no theory by which [a claim] could entitle the Chapmans to relief against [Plaintiffs]." (Pivot Dec. 27, 2010 Br. 4)

### 1.     The Chapmans' Potential Claims Against A&E and D&D

In a June 1, 2007 letter to A&E and D&D, the Chapmans' "litigation counsel" stated:

> I am writing with regard to the television program "Dog the Bounty Hunter" which D&D Television Productions, Inc. and Hybrid Films, Inc. produce and broadcast on A&E Television Networks ("the Program"). We are writing to demand that you immediately cease and desist paying any further sums to Boris Krutonog or Pivot Point Entertainment in connection with the Program, as such sums constitute improper payments to these entities, contrary to California law. We intend to hold you fully responsible for damages resulting to our clients from any future payments to these entities.
>
> Our clients have commenced proceedings before the California Labor Commissioner against Krutonog and Pivot Point Entertainment (collectively, "Defendants"). A copy of the Petition to Determine Controversy filed by our clients against Defendants with the Labor Commissioner is enclosed. In those proceedings, our clients intend to prove that Defendants acted improperly in representing our clients on various projects. In particular, Defendants acted as unlicensed talent agents in violation of the California Talent Agencies Act at California Labor Code Sections 1700 et seq. by procuring or attempting to procure engagements for our clients as artists, including, but not limited to, the Program, as well as other acting engagements.
>
> We have learned that contracts exist between D&D Television Productions, Inc., and Hybrid Films, Inc., and/or A&E Television Networks (collectively "the Producers"), on the one hand, and Defendants, on the other hand, which purport to require one or more of the Producers to pay fees to the Defendants. Such "fees" in actuality constitute unlawful commissions on our clients' earnings relating to the Program contrary to the provisions of the Talent Agencies Act because Defendants are not licensed talent agents and are not entitled to procure or attempt to procure work without a talent agent's license. Our clients have specifically alleged in the Labor Commissioner proceedings and intend to prove that the commissions have been unlawfully disguised as "producer fees" to subvert the provisions of the Labor Code (see enclosed Petition, ¶11, 12). Therefore, no further sums should be paid to Defendants pending the Labor Commissioner's determination. If you persist in making such payments, you will be assisting [Pivot Point's] commission of unlawful acts in violation of their duties under California law.

        Mr. Chapman and Ms. Barmore-Smith hereby demand that D&D Television Productions, Inc., Hybrid Films, Inc., and/or A&E Television Networks cease paying any further amounts to Boris Krutonog and/or Pivot Point Entertainment based on or relating to "Dog The Bounty Hunter." All such monies should, at a minimum, be held in trust pending the resolution of the proceedings before the Labor Commissioner.

        Govern yourselves accordingly.

(Houts Decl., Ex. B)

        In the California Labor Commissioner proceeding, the Chapmans have argued that A&E, D&D, and Pivot Point conspired to perpetrate a fraud on the Chapmans and to breach their respective contractual obligations to the Chapmans.[3] The Chapmans contend that A&E and D&D "entered into a separate, confidential agreement" with Pivot Point in which they agreed to pay Pivot Point a "producer fee" that "was in fact a ruse, designed to conceal [Pivot Point's] unlawful activities as Petitioners' de facto talent agents."[4] (King Decl. Ex. 8, ¶ 11)  The Chapmans further allege that Pivot Point's "'producer fee' was [to be paid] directly out of the amount that [the Chapmans] were informed and believed that they were to receive [from A&E and D&D] for their services in conjunction with 'Dog the Bounty Hunter.'" (Id.)

---

[3] The Chapmans have separate agreements with Pivot Point, and with A&E/D&D. (King Decl., Ex. 8 at ¶¶ 6-7; Ex. 5; Ex. 6)

[4] The TAA does not appear to provide any remedy other than a determination that a contract is void. See Marathon Entertainment, Inc. v. Blasi, 42 Cal. 4th 974, 990-91 (Cal. 2008) ("What is the artist's remedy for a violation of the [TAA]? . . . On this question, [the TAA] offers no assistance. The [TAA] is silent – completely silent – on the subject of the proper remedy for illegal procurement.") The legislative history of the TAA suggests that the Commissioners believed that common law remedies would be employed once a contract was found violative of the TAA: "'The majority of the Commission believes that existing civil remedies, which are available by legal action in the civil courts, to anyone who has been injured by breach of the [TAA], are sufficient to serve the purposes of deterring violations of the [TAA] and punishing breaches. These remedies include actions for breach of contract, fraud and misrepresentation, breach of fiduciary duty, interference with business opportunity, defamation, infliction of emotional distress, and the like.'" Id. at 994 (quoting Cal. Entertainment Com., Rep. at 17-18 (Dec. 2, 1985)).

The Chapmans have stated that they may sue Plaintiffs for "fraud, breach of the understanding between the Chapmans and [Plaintiffs] [and] violation of [the] covenant of good faith and fair dealing. . . ." (Transcript of January 5, 2011 Interpleader Hearing ("Tr.") at 17) The Chapmans' representations in the California administrative proceeding and this interpleader action are sufficient to demonstrate that A&E and D&D have a "good faith concern" that the Chapmans may sue them if they pay over to Pivot Point the fees and royalties due under the Pivot Point Agreement. Given that Pivot Point has already sued A&E and D&D for these same monies in the New York Action, Plaintiffs here have demonstrated a "good faith concern about duplic[ative] litigation and multiple liability." Sotheby's, Inc., 802 F. Supp. at 1065.

### B. Venue

Plaintiffs claim that venue is appropriate here under 28 U.S.C. § 1391, the general venue statute. Section 1391(b)(2) provides that

> [a] civil action wherein jurisdiction is not founded solely on diversity of citizenship may, except as otherwise provided by law, be brought only in . . . (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated. . . .

28 U.S.C. § 1391(b)(2).

Pivot Point argues, however, that this action must be dismissed for improper venue under 28 U.S.C. § 1397, which states that

> [a]ny civil action of interpleader or in the nature of interpleader under section 1335 of this title may be brought in the judicial district in which one or more of the claimants reside.

28 U.S.C. § 1397. Pivot Point contends that "[s]tatutory interpleader under Section 1335 in federal court is unavailable because it may be brought only in the states of defendants' citizenship." (Pivot Dec. 28, 2010 Br. 3 (citing 28 U.S.C. § 1397))

10

Section 1397 uses the permissive word "may" rather than "must." In Mark E. Mitchell, Inc. v. Charleston Library Society, 114 F. Supp. 2d 259, 263 (S.D.N.Y. 2000), the court concluded that Section 1397 "merely permits venue in an interpleader action to be laid in a district in which a claimant resides. It does not limit venue to such a district." That decision will be followed here.

Venue is appropriate in this District in light of the parties' agreement that state and federal courts in New York County would have exclusive jurisdiction to resolve any disputes arising under the Pivot Point Agreement. (Houts Decl. Ex. A ¶ 9). Given that venue is not constitutionally mandated but is "largely a matter of litigational convenience," Wachovia Bank v. Schmidt, 546 U.S. 303, 316 (2006), the parties' agreement to submit their disputes to a New York court will be respected. Koninklijke Philips Electronics v. Digital Works, Inc., 358 F. Supp. 2d 328, 331 (S.D.N.Y. 2005) ("a contractual forum selection clause should be enforced 'unless it is clearly shown that enforcement would be unreasonable and unjust or that the clause was obtained through fraud or overreaching.'" (quoting Jones v. Weibrecht, 901 F.2d 17, 18 (2d Cir. 1990))); Laufer Group Int'l v. Tamarack Industries, LLC, 599 F. Supp. 2d 528, 532 (S.D.N.Y. 2009) ("[a] forum selection clause constitutes consent to venue in the chosen forum"); see also Mark E. Mitchell, Inc., 114 F. Supp. 2d at 262 ("'it would seem that if procedural convenience [of pendant jurisdiction] is enough to avoid the constitutional limitations on the jurisdiction of the federal court, it should suffice also to dispense with the purely statutory requirements as to venue.'" (quoting Beattie v. United States, 756 F.2d 91, 101 (D.C. Cir. 1984))).

The doctrine of judicial estoppel also requires rejection of Pivot Point's venue argument. "[J]udicial estoppel [may] be invoked [where] (1) the party against whom it is

11

asserted [has] advanced an inconsistent position in a prior proceeding, and (2) the inconsistent position [was] adopted by the court in some matter." Peralta v. Vasquez, 467 F.3d 98, 105 (2d Cir. 2006). In the California interpleader action, Pivot Point successfully argued that venue there was improper – even though Pivot Point resides in California (Cmplt. ¶ 4) – because the forum selection clause in the Pivot Point Agreement designates New York County courts as having exclusive jurisdiction. A&E Television Networks, LLC v. Pivot Point Entertainment, LLC, 2:10-CV-04978(JST), Dkt. No. 16, at 20 (C.D. Cal. Sept. 27, 2010) (arguing in motion to dismiss that "venue is not proper in Los Angeles in view of the forum selection clause. That clause provides that the courts in New York County, New York shall be the exclusive forum. . . . If Pivot were to have to litigate with the Chapmans [in California] over an interpleaded stake, Pivot would lose the benefit of being able to require [A&E] and D&D witnesses to appear to testify in person at trial."). Having prevailed on this argument in California, Pivot Point cannot now contend that New York is an improper forum because the action should have been brought in California.

### C. Abstention and Laches

Pivot Point also argues that this Court should abstain in favor of the New York Action, and that Plaintiffs' action is barred by laches.

Federal courts have a "virtually unflagging obligation . . . to exercise the jurisdiction given them." Colorado River Water Conservation Dist. v. United States, 424 U.S. 800, 817 (1976). Only "exceptional" circumstances "permit[] the dismissal of a federal suit due to the presence of a concurrent state proceeding." Id. at 818. In determining whether "exceptional circumstances" exist, courts should consider whether a prior court has assumed jurisdiction over property, "the inconvenience of the federal forum," "the desirability of avoiding

12

piecemeal litigation," and "the order in which jurisdiction was obtained by the concurrent forums." Id. (citations omitted). "No one factor is necessarily determinative; a carefully considered judgment taking into account both the obligation to exercise jurisdiction and the combination of factors counseling against that exercise is required. Only the clearest of justifications will warrant dismissal." Id. at 818-19 (citations omitted).

Here, the only factor supporting abstention is that the New York Action was initiated before the instant case. The "desirability of avoiding piecemeal litigation" factor weighs heavily here, however, given that piecemeal litigation will result absent this Court's exercise of jurisdiction. Because the Chapmans are not parties to the New York Action and A&E/D&D are not parties to the proceedings before the California Labor Commissioner, those proceedings will not resolve the issues raised by Plaintiffs' interpleader complaint. In short, Pivot Point has not demonstrated that "exceptional circumstances" exist that supersede this Court's "unflagging obligation" to exercise jurisdiction.[5]

---

[5] Pivot Point argues that abstention is justified under Wilton v. Seven Falls Co., 515 U.S. 277 (1995), and Brillhart v. Excess Ins. Co., 316 U.S. 491 (1942). Those cases are not on point, however, because they were brought under the Declaratory Judgment Act, where district courts enjoy "greater discretion" to abstain. Wilton, 515 U.S. at 286. This action was not brought under the Declaratory Judgment Act, and thus the Colorado River standard applies.

In any event, abstention would not be appropriate under the discretionary factors set forth in Wilton and Brillhart. Under those cases, a court should consider: "(1) the scope of the pending state proceeding and the nature of the defenses available there; (2) whether the claims of all parties in interest can satisfactorily be adjudicated in that proceeding; (3) whether the necessary parties have been joined; and (4) whether such parties are amenable to process in that proceeding . . . . (5) avoiding duplicative proceedings; . . . (6) avoiding forum shopping. . . . (7) the relative convenience of the fora; (8) the order of filing; and (9) choice of law." TIG Ins. Co. v. Fairchild Corp., No. 07 Civ. 8250(JGK), 2008 WL 2198087, at *2 (S.D.N.Y. May 27, 2008) (citing National Union Fire Ins. Co. v. Warrantech Corp., No. 00 Civ. 5007, 2001 WL 194903, at *3 (S.D.N.Y. Feb. 27, 2001)).

Because of forum selection clauses in their contracts with Plaintiffs, both Pivot Point and the Chapmans "are amenable to process in [this] proceeding." Moreover, as noted above, the

The doctrine of laches also does not warrant dismissal. Although Pivot Point notes that the New York Action was filed in May 2008, and argues that Plaintiffs delayed two and a half years in bringing this interpleader action, Plaintiffs' motion to dismiss or stay the New York Action was not resolved until June 2010. Once that motion was denied, it became clear that Plaintiffs were truly at risk of "duplicative litigation and multiple liability." Plaintiffs filed their first interpleader action within one month of the New York court's denial of their motion to stay or dismiss, and filed this action one week after the California court's dismissal for improper venue. There has been no undue delay.

### III.  DISCHARGE

Plaintiffs are directed to submit a proposed discharge order by January 25, 2011. Pivot Point and the Chapmans will respond to the proposed order by February 1, 2011. Defendants should also address whether they disagree with Plaintiffs' calculation of the amount to be deposited in this Court's Registry, and what, if any, discovery will be necessary to resolve this issue.

---

Chapmans are not parties to the New York state court proceeding. Accordingly, their rights will not be adjudicated in that proceeding. The choice of law and convenience factors are neutral. This Court also finds – contrary to Pivot Point's arguments (Pivot Dec. 27, 2010 Br. 2) – that forum-shopping is a neutral factor. There is no basis for finding forum-shopping here given the parties' agreement to resolve their disputes in New York courts. Finally, while the New York Action was filed first, that factor does not weigh heavily here, because (1) little has taken place in that litigation other than the denial of A&E/D&D's motion to dismiss; and (2) that action will not result in a complete adjudication of all of the claimants' rights.

## **CONCLUSION**

For the reasons set forth above, this interpleader action will proceed. Plaintiffs are directed to deposit into this Court's Registry, by January 25, 2011, $2,400,732.59. Plaintiffs are likewise directed to deposit into the Court's Registry additional fees and royalties due under the Pivot Point Agreement as those amounts become due.

Dated: New York, New York
      January 18, 2011           SO ORDERED.

                                                Paul G. Gardephe
                                                United States District Judge