UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| A&E TELEVISION NETWORKS, LLC, a Delaware limited liability company; and D&D TELEVISION PRODUCTIONS, INC., a New York corporation, <br><br>                  Plaintiffs, <br><br>    -against- <br><br> PIVOT POINT ENTERTAINMENT, LLC, a California limited liability company; DUANE CHAPMAN, an individual; and ALICE BARMORE-SMITH CHAPMAN, an individual, <br><br>                 Defendants. | 10 Civ. 9422 (AJN)(JLC) <br> ECF Case <br><br> **DUANE AND BETH CHAPMAN'S MEMORANDUM OF LAW IN OPPOSITION TO PIVOT POINT ENTERTAINMENT LLC'S MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT AGAINST THE CHAPMAN DEFENDANTS** <br><br> Action Filed: December 17, 2010 |
| AND RELATED COUNTERCLAIMS AND CROSS-CLAIMS | |

Defendants/Cross-Claimants Duane Chapman ("Dog") and Beth Chapman ("Beth"),

erroneously sued as Alice Barmore-Smith Chapman (collectively, the "Chapmans"), hereby

submit this memorandum of law in opposition to the Motion by Defendant/Counter-

Claimant/Cross-Defendant Pivot Point Entertainment, LLC ("Pivot Point") for Summary

Judgment or Partial Summary Judgment Against the Chapmans (the "Motion").

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

**TABLE OF CONTENTS**

**Page(s)**

I.  INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.  RELEVANT FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . 5

    A.  Krutonog Was the Chapmans' Manager; He Performed
        No Other Meaningful Services in Connection with the Program . . . . . . . . . 5

    B.  Krutonog Negotiated Contract Renewals for the Chapmans
        and for Himself, but Placed His Own Economic Interests
        Before Those of His Clients . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    C.  The Chapmans Never Approved Krutonog's Compensation;
        Krutonog Breached the Fiduciary Duties
        He Owed to the Chapmans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    D.  Krutonog Breached His Contract by Failing To Fulfill His Duties
        as the Chapmans' Manager, and as a Result, Krutonog Was Terminated . . . 12

    E.  Plaintiffs Filed This Interpleader Action To Resolve the Parties'
        Competing Claims to the Monies on Deposit with the Court . . . . . . . . . . 14

III.  ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

    A.  The Court Must Deny Summary Judgment Because the
        Labor Commissioner Has Exclusive Jurisdiction Over
        Essential Matters Raised Here . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

    B.  The Court Cannot Resolve the Breach of Fiduciary Duty Issue
        on Pivot Point's Motion for Summary Judgment . . . . . . . . . . . . . . . . . 18

    C.  The Chapmans Are Intended Third-Party Beneficiaries of the
        Co-Executive Producer Agreement, Which Pivot Point Breached . . . . . . 20

    D.  The Chapmans Are Not Seeking To Enforce an Illegal Contract;
        They Are Seeking To Prevent Pivot Point from Enforcing It . . . . . . . . . 23

IV.  CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

# TABLE OF AUTHORITIES

**Page(s)**

## FEDERAL CASES

*Anderson v. Liberty Lobby, Inc.*
  477 U.S. 242 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17, 20

*Cramer v. Devon Grp.*
  774 F. Supp. 176 (S.D.N.Y. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Debary v. Harrah's Operating Co.*
  465 F. Supp. 2d 250 (S.D.N.Y. 2006) . . . . . . . . . . . . . . . . . . . . . . . 21, 22

*In re "Agent Orange" Prod. Liab. Litig.*
  517 F.3d 76 (2d Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*NetJets Aviation, Inc. v. LHC Commc'ns, LLC.*
  537 F.3d 168 (2d Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Septembertide Pub., B.V. v. Stein & Day, Inc.*
  884 F.2d 675 (2d Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Subaru Distribs. Corp. v. Subaru of Am., Inc.*
  425 F.3d 119 (2d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21

*Trans-Orient Marine Corp. v. Star Trading & Marine, Inc.*
  925 F.2d 566 (2d Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22-23

*Vista Co. v. Columbia Pictures Indus., Inc.*
  725 F. Supp. 1286 (S.D.N.Y. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . 23

## STATE CASES

*Aievoli v. Farley*
  223 A.D.2d 613 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Buchwald v. Superior Court*
  254 Cal. App. 2d 347 (1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Cnty. of San Bernardino v. Walsh*
  58 Cal. App. 4th 533 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 25

**STATE CASES** *(continued)* <span style="float:right">Page(s)</span>

*Jarvis v. O'Brien*
    147 Cal. App. 2d 758 (1957) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Key Int'l Mfg., Inc. v. Morse/Diesel, Inc.*
    142 A.D.2d 448 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Logan-Baldwin v. L.S.M. Gen. Contractors, Inc.*
    94 A.D.3d 1466 (2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Marathon Entm't, Inc. v. Blasi*
    42 Cal. 4th 974 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Styne v. Stevens*
    26 Cal. 4th 42 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Terry v. Bender*
    143 Cal. App. 2d 198 (1956) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

**STATE STATUTES**

Cal. Lab. Code § 1700.44 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

## MEMORANDUM OF POINTS AND AUTHORITIES

**I.     INTRODUCTION**

Boris Krutonog ("Krutonog") breached his fiduciary duties to the Chapmans by placing his own economic interests ahead of the interests of his clients.  Krutonog, the Chapmans' former manager, now seeks to prevent the Chapmans from recovering any portion of the monies that A&E Television Networks, LLC ("AETN") and D&D Television Productions, Inc. ("D&D") (together, "Plaintiffs") have interpleaded with the Court.  However, those monies represent unlawful management commissions that Krutonog and his company Pivot Point allegedly earned in connection with their work on the television series *Dog the Bounty Hunter* (the "Program"), but are no longer entitled to receive as a result of their violations of the California Talent Agency Act (the "TAA"), their egregious breaches of fiduciary duties, and their failure to fulfill their duties as the Chapmans' manager.  Pivot Point has no legitimate claim to the interpleaded funds, and has not demonstrated that it is entitled to summary judgment in light of all of the outstanding material issues of fact regarding Krutonog's unlawful conduct that must be decided by a jury.

The Court was rightfully "skeptical" when it permitted Pivot Point to file this Motion following the parties' pre-motion conference on March 23, 2012.  The Court noted that while it was not in a position to dissuade Pivot Point from filing the Motion, it was not convinced that summary judgment would lead to a narrowing of issues.  (Declaration of Andrew B. Brettler, dated Aug. 24, 2012, Ex. A (Hr'g Tr. at 26:16–17).)[1]  As the Court correctly presumed, there are numerous material factual issues that must be resolved prior to or at trial of this action.  The existence of these factual disputes preclude the Court from granting summary judgment, or even

---

[1]  Unless otherwise indicated, all Exhibits referenced herein are attached to the Brettler Declaration.

partial summary judgment, in favor of Pivot Point.  Until these factual issues are resolved at trial and/or by the Office of the California Labor Commissioner, which has exclusive and original jurisdiction over the matters pertaining to whether Krutonog violated the TAA, the Court cannot dispose of, or narrow, any of the issues that are the subject of this Motion.

*First*, Krutonog's so-called Co-Executive Producer Agreement is a subterfuge to disguise the payment of illegal management commissions as producer fees in a transparent effort to prevent the Chapmans from controlling Krutonog's compensation even though he worked for them and was paid to be their manager.  Because Krutonog violated the TAA by acting as an unlicensed talent agent on behalf of the Chapmans and is not entitled to receive the management commissions originally payable thereunder, the Co-Executive Producer Agreement is void and unenforceable.  Under California law, which governs the relationship between Krutonog and his former clients, all management commissions previously payable to Krutonog and/or Pivot Point must be forfeited and returned to the Chapmans.

*Second*, in addition to the Co-Executive Producer Agreement being unenforceable, Pivot Point is not entitled to any of the monies on deposit with the Court because Krutonog breached his fiduciary duties to the Chapmans.  Among other things, Krutonog put his own financial interests ahead of the interests of his clients.  When Krutonog was renegotiating the Chapmans' 2005 contract for the Program, he failed to inform the Chapmans of the initial offer that AETN presented                                        In a clear breach of his fiduciary duties, instead of making a counteroffer to maximize his clients' compensation, Krutonog negotiated a deal for himself that permitted him to take a percentage of the Chapmans' pay raise.  Krutonog

impermissibly tied himself to the "life of the show" by disingenuously claiming that he owned the rights to Dog's life story, without ever compensating Dog for those purported rights.

Krutonog should have obtained express written consent from the Chapmans before entering into an agreement containing a "life of the show" provision that benefitted him at the Chapmans' expense. Regardless of the title of his agreement, Krutonog was not a producer, executive producer, or co-executive producer of the Program. Krutonog and Pivot Point were compensated for providing management services to the Chapmans—nothing more. Had Krutonog not breached his fiduciary duty to the Chapmans by entering into a secret deal to be compensated by Plaintiffs—out of the Chapmans' monies no less—instead of by the Chapmans directly (as talent managers are traditionally paid) we would not be here today.

**Third**, besides the breach of fiduciary duty and illegality/unenforceability arguments, the Chapmans are entitled to the monies on deposit with the Court because they were third-party beneficiaries of Pivot Point's so-called Co-Executive Producer Agreement. Despite his denial of this otherwise undisputed fact, Krutonog was the Chapmans' manager and performed talent management services for the Chapmans in connection with the Program and otherwise. The Chapmans confirm this fact, as does attorney Les Abell (who represented both the Chapmans and Krutonog), as well as executives from AETN and D&D. Even Krutonog's ex-wife, while she was still married to Krutonog, referred to him as Dog's manager. In that capacity, Krutonog received slightly more than 15% of the Chapmans' compensation as management commissions.

Rather than the Chapmans paying Krutonog these management commissions directly, Krutonog negotiated a separate contract for himself, whereby AETN and D&D would pay Pivot Point out of the monies that were otherwise allocated to Dog and the members of the "posse," which was comprised of Beth, Leland Chapman, Tim Chapman and Duane Lee Chapman.

Although Pivot Point's separate contract with Plaintiffs was called a Co-Executive Producer Agreement, Krutonog performed *no* producer services in connection with the Program. Multiple witnesses confirmed this fact at depositions. Even Krutonog was unable to present any evidence that he performed any services as a producer, executive producer, or co-executive producer. Krutonog and Pivot Point were compensated solely for the management services they provided to the Chapmans in connection with the Program. Krutonog's job, as explained by AETN and D&D executives, was to "wrangle the talent" and "act as a liaison" between the Chapmans, on the one hand, and the network and production company, on the other hand. When Krutonog failed to fulfill his management obligations to the Chapmans, he was terminated. From that point forward, Krutonog and Pivot Point were no longer entitled to any payments under the Co-Executive Producer Agreement, as such payments would be the equivalent of receiving unearned management commissions.

For these reasons, the Court cannot enter summary judgment in Pivot Point's favor. The issue of breach of fiduciary duty alone precludes such a finding because there are numerous factual components that go into the determination of whether a party has in fact breached its fiduciary duty to another party. Further, whether Krutonog acted as an unlicensed talent agent in violation of the TAA is a material issue of fact that must first be decided by the California Labor Commissioner who has *exclusive* jurisdiction over that issue. That determination is still *sub judice*. Pivot Point's Motion goes well-beyond asking this Court to resolve a run-of-the-mill breach of contract action. As the Chapmans and Plaintiffs represented to the Court at the pre-motion conference, the numerous factual issues and the interplay between and among the parties to this interpleader action can only be resolved following a trial on the merits.

## II.   RELEVANT FACTUAL BACKGROUND

### A.   Krutonog Was the Chapmans' Manager; He Performed No Other Meaningful Services in Connection with the Program.

Nearly every witness who testified at deposition in this matter confirmed that Krutonog was the Chapmans' manager.  (Declaration of Duane "Dog" Chapman, dated August 22, 2012 ("Dog Decl.") ¶¶ 2, 5–7; Declaration of Beth Chapman, dated August 22, 2012 ("Beth Decl.") ¶¶ 2–4; Ex. D (Beth Dep. vol. I) at 17:24–18:1, 19:13–21, 21:18–25; Ex. F (Dog Dep.) at 27:11–21, 99:7–14; Ex. G (Cohen Dep.) at 13:6–15;  Ex. H (Houts Dep.) at 96:2–24, 260:13–261:5; Ex. O (Reilly-Brooks Dep.) at 148:25–149:1, 274:1–10.)  Even publicist Maureen Kedes, Krutonog's ex-wife, referred to Krutonog as Dog's manager in a May 25, 2005 email sent while she was still married to Krutonog.  (Ex. 82.)  And, despite his attempts to deny the truth, Krutonog himself was forced to concede this point at his deposition.  (Ex. J (Krutonog Dep. vol. I) at 194:14–19.)

Although Krutonog claims that he produced and/or developed programs for the Chapmans, he did no such thing.  His unsupported assertion apparently stems from the allegation that Krutonog owned the rights to Dog's "life story," and was permitted to exploit those rights on television and other media.  However, Krutonog never purchased Dog's life rights, or exercised his purported options to purchase those rights.  In reality, Krutonog did nothing more than draft a series of so-called "Life Story Option Agreements" that he had Dog sign only after convincing Dog that Krutonog needed those agreements to be able to sell Dog's story.  Krutonog never paid Dog any consideration to acquire the options.  (Dog Decl. ¶ 3.)  Further, and more importantly, Krutonog never executed any of the purported options to acquire Dog's life story rights. Krutonog never paid Dog the exercise price or even provided Dog with the requisite written notice of intent to exercise.  (Dog Decl. ¶ 4.)  Krutonog admitted that he did not "remember

paying [to] exercise" the options, and that he did not think he ever did so. (Ex. K (Krutonog

Dep. vol. II) at 431:12–19; Ex. L (Krutonog Dep. vol. III) at 576:20–577:5, 602:2–16.)[2] Pivot

Point and/or Krutonog have not produced a shred of evidence in these proceedings, or in any

related proceeding, that they made any of the payments required under the agreements, or

provided the necessary notice to exercise the options.

Nonetheless, in 2003, when Hybrid Films, Inc. ("Hybrid"), the predecessor to D&D,

approached the Chapmans about appearing in a reality television program, Krutonog essentially

begged the Chapmans to be attached to the project, and involved himself with the project by

facilitating a bidding war—as talent managers often do—between Hybrid and CBS Television,

an entity that was also interested in creating a show about Dog's bounty hunting exploits. (Dog

Decl. ¶ 10; Beth Decl. ¶ 5; Ex. D (Beth Dep. vol. I) at 163:4–23.) Once Dog's initial contract to

appear on the Program was finalized with Hybrid (Dog Decl. ¶ 23 & Ex. 89), Krutonog

negotiated his own deal with the producers. (Declaration of Howard E. King, dated July 13,

2012 ("King Decl.") Ex. 7.) The purpose of Krutonog's deal was to provide a mechanism for

Krutonog to be paid management commissions by the producers and/or the network (rather than

by the Chapmans directly) for the work Krutonog did managing the Chapmans in connection

with the Program. (Dog Decl. ¶ 11; Beth Decl. ¶ 6; Ex. E (Beth Dep. vol. II) at 238:22–239:10.)[3]

---

[2] As was the case with the various Life Story Option Agreements dating back to 1995, Krutonog failed to pay Dog any monetary or other consideration for the purported Life Rights Agreement, dated June 30, 2004, between Krutonog and Dog. Krutonog, who drafted that one-sided agreement for Dog's signature, never even sent the full agreement to Dog or Dog's attorneys for review before demanding that Dog sign it. (Dog Decl. ¶¶ 8–9; Ex. F (Dog Dep.) 605:17–606:7, 606:21–607:15, 608:12–18.)

[3] Incidentally, Krutonog negotiated to be paid approximately 15% of Dog's compensation, which is the typical commission rate that a manager charges his client. Tying a producer's salary to the salary earned by the talent appearing in a television program is unheard of. Producers are simply not compensated in that way.

Although the Chapmans were aware that Krutonog was negotiating a separate deal for himself, the terms of Krutonog's deal were kept secret from the Chapmans—i.e., Krutonog and his attorneys never permitted the Chapmans, or their attorney, Mr. Abell, to review Krutonog's contract even when the Chapmans asked permission to do so. (Dog Decl. ¶ 12; Beth Decl. ¶ 7; Ex. B (Abell Dep.) at 28:4–12; Ex. E (Beth Dep vol. II) at 202:4–15; Ex. F. (Dog Dep.) at 37:23–38:5.) Accordingly, Dog and his counsel were unaware that Krutonog purportedly attached himself to the Program for the "life of the show." (Dog Decl. ¶ 12; Beth Decl. ¶ 7; Ex. F (Dog Dep.) at 14:13–22, 38:14–15.) Krutonog even admits in his declaration that the Program's producers did not attempt to inform Beth or Mr. Abell about the monies that Krutonog was to receive under his 2003 agreement until nearly a year *after* the agreement was finalized. (Declaration of Boris Krutonog, dated July 13, 2012 ("Krutonog Decl.") ¶ 21.)

Although Krutonog's contract was titled "Co-Executive Producer Agreement," Krutonog provided *no* producer, executive producer, or co-executive producer services whatsoever in connection with the Program. (Dog Decl. ¶ 11; Beth Decl. ¶ 6; Ex. G (Cohen Dep.) at 13:6–13; Ex. H (Houts Dep.) at 96:11–24.) When asked specifically to describe what Krutonog did "as a co-executive producer" of the Program, David Houts, a principal of Hybrid and D&D, testified that Krutonog "managed the relationship between the Chapmans and the production and the network." Mr. Houts confirmed that he did not "seek out" Krutonog to be the co-executive producer of the Program, and that Krutonog did not provide "any value-added service" to the Program aside from being the Chapmans' manager. (Ex. H (Houts Dep.) at 278:14–17, 283:4–13.) The title "Co-Executive Producer" was nothing more than an honorific credit graciously bestowed on Krutonog because he provided management services to the Chapmans.

All monies Krutonog was paid under his agreement with Hybrid were management commissions he otherwise would have been paid by the Chapmans directly.  (Dog Decl. ¶ 11; Beth Decl. ¶ 6.)

**B.**     **Krutonog Negotiated Contract Renewals for the Chapmans and for Himself, but Placed His Own Economic Interests Before Those of His Clients.**

After two successful seasons of the Program, the Chapmans sought to renegotiate their contracts.  Krutonog spearheaded the renegotiations on their behalf.  (Dog Decl. ¶ 14; Ex. J (Krutonog Dep. vol. I) at 49:17–23.)  At one point during the renegotiation of Dog's contract, AETN's in-house attorney Maggie Reilly-Brooks emailed Mr. Abell, to offer Dog and the posse

(Ex. 13 at 1–2.)  In Ms. Reilly-Brooks' October 19, 2005 email she expressly wrote:

(Ex. 13 at 1 (emphasis added).)  Mr. Abell forwarded AETN's email to Krutonog and/or discussed its contents with Krutonog.  (Ex. L (Krutonog Dep. vol. III) at 612:18–613:4; Ex. B (Abell Dep.) at 236:16–237:10.)

Rather than sharing this information with his clients, Krutonog decided that it was in ***his*** best interest to negotiate his own deal, separate and apart from the one for the Chapmans. Krutonog testified that he did not remember ever telling Dog about AETN's initial offer

(Ex. L (Krutonog Dep. vol. III) at 614:24–615:14.) While Krutonog believes that he may have discussed AETN's offer with Beth, he did not recall whether he informed Beth that it was not the network's intention to increase his compensation as part of the contract negotiations.  (Ex. L (Krutonog Dep. vol. III) at 616:5–13).)  Even more outrageous is Krutonog's testimony that he did not remember presenting a counteroffer to AETN that did ***not*** include a proposal to increase his own compensation.  (Ex. L (Krutonog Dep. vol. III) at 616:22–617:6.)  Specifically, Krutonog acknowledged that he "went back to Maggie

Reilly-Brooks to negotiate for [his] part," and he "***took whatever [his] portion . . . was from . . . the entire posse.***"  (Ex. L (Krutonog Dep. vol. III) at 617:18–22 (emphasis added).)

Ultimately, Krutonog was successful in getting the network and the producers to amend his 2003 contract and increase his fee.  (King Decl. Ex. 19.)  Krutonog arranged to share in the

████████████████████████████████████████████████████

Monies that Krutonog set aside for himself would have been payable to the Chapmans.  If Krutonog were truly a producer on the Program, his payment as a producer would have come out of the producer's budget rather than from the Chapmans' allocated pot.  That Krutonog's so-called "co-executive producer fee" came from the Chapmans' negotiated sum is significant evidence that Krutonog was paid as the Chapmans' manager, and ***not*** as a producer.  In addition, Krutonog arranged to be paid an exclusivity fee even though his contract expressly provided that he was ***not*** exclusive to the Program.  (*Compare* King Decl. Ex. 7 ¶ 4 *with* King Decl. Ex. 19 ¶ 3(f); *see also* Ex. O (Reilly-Brooks Dep.) at 221:2–226:6) (testifying that she had no understanding of why Krutonog was receiving an exclusivity fee); Ex. H (Houts Dep.) at 284:7–286:14 (same).)

Krutonog's 2005 contract contained a confidentiality provision that prevented anyone from disclosing the terms of his deal to the Chapmans.  (King Decl. Ex. 19 ¶ 3(h); Dog Decl. ¶ 16; Beth Decl. ¶ 9.)  As a result, Krutonog was able to keep this arrangement secret from the Chapmans by failing to disclose to them that he was being paid from the same pot of money used to pay Dog and the posse.  (Dog Decl. ¶¶ 16, 21 & Ex. 20; Beth Decl. ¶ 9; Ex. F (Dog Dep.) at 40:8–10.)  In fact, in a December 12, 2006 email attachment sent to AETN executive Neil Cohen, the Chapmans' representative, Alan Nevins, confirmed that ███████████████████████

████████████████████████████████████████████████████ that was

negotiated last year. He feels betrayed and also feels that [Krutonog] has not been working

enough to justify his salary." (Ex. 38 at AETN001251.)

C.    **The Chapmans Never Approved Krutonog's Compensation; Krutonog
       Breached the Fiduciary Duties He Owed to the Chapmans.**

Krutonog incorrectly asserts that Dog and/or Beth somehow approved this compensation

arrangement. Not so. For one thing, the Chapmans were not permitted to review Krutonog's

contract because of the confidentiality clause contained therein. Mr. Abell testified that when he

requested to get a copy of Krutonog's agreement from Ms. Reilly-Brooks, she told him "there

was a confidentiality agreement between the production company and [Krutonog] and she could

not release it . . . or authorize its release." (Ex. B (Abell Dep.) at 47:2–13.) Beth's testimony

also supports Mr. Abell's testimony: "David [Houts] told Les Abell that they [AETN] weren't

going to give it [to us] because there was a confidentiality clause in it." (Ex. D (Beth Dep. vol. I)

at 62:24–63:1); Ex. E (Beth Dep. vol. II) at 269:11–20); Ex. F (Dog Dep.) at 155:25–3.)

Beth also testified that she never saw—and therefore never confirmed or approved—the

Microsoft Excel spreadsheet that Mr. Houts allegedly created and sent to her, which set forth the

per episode payments to the various individuals involved in the Program. (Ex. E (Beth Dep.

vol. II) at 401:16, 402:6–8, 402:12–20.) Mr. Houts could not testify with certainty that he ever

sent a copy of the Excel file to Beth for her review. Instead, Mr. Houts recalled that he might

have "only provided [the spreadsheet] to [Krutonog] and expected [it] to be distributed to [Beth],

I don't know." (Ex. H (Houts Decl.) at 184:25–185:2.)

Lastly, Pivot Point focuses on an October 27, 2005 email from Beth to Krutonog as proof

positive that Beth approved Krutonog's allocation of the ▮▮▮▮▮ in which he allocated a

substantial portion of those monies to himself. Beth's testimony demonstrates that she caught

wise to Krutonog's underhanded scheme to secretly take from the Chapmans' pot: "We were

told [by Krutonog and Abell] that [AETN] threw out ███████ to pay the posse." (Ex. D (Beth

Dep. vol. I) at 81:14–22.) Beth's testimony continued that when she received Krutonog's email

she "politely" told Krutonog that the breakdown "looked good," but in reality she "wanted to

take this information to [Dog] to show him how dishonest and crooked [Krutonog] was." (Beth

Decl. ¶ 10; Ex. D (Beth Dep. vol. I) at 82:10–24.)  Indeed, Beth presented Krutonog's email to

Dog and pointed out to him that her name "wasn't even on the list, and that the five posse

members [Krutonog] had listed was himself, the three boys and Duane." (Ex. D (Beth Dep.

vol. I) at 82:25–83:8.)  Realizing that Krutonog was "out for himself," as evidenced also by the

fact that Krutonog attempted to commission Beth's earnings even though he never allocated any

portion of the fee to her (Beth Decl. ¶ 10), Beth testified, "at that point it did not behoove [her] to

let [Krutonog] know that [she] was onto him." (Ex. D (Beth Dep. vol. I) at 84:6–12.)  Armed

with this new information, Dog agreed to "look into it," and would question Krutonog and

Mr. Abell about the financial arrangement. (Ex. D (Beth Dep. vol. I) at 84:19–23.)  At that point,

both Krutonog and Mr. Abell lied to Dog by representing that AETN was paying Krutonog out of

a separate pot of money.  (Ex. D (Beth Dep. vol. I) at 84:20–23.)

Even if Beth had approved the payment arrangement (she did not), or if Krutonog

interpreted her email as tacit approval of the financial breakdown, Beth had no authority to

approve anything on Dog's behalf.  It would have been unreasonable for Krutonog to believe that

Beth had such authority.  As Beth explained during her deposition, she was only Dog's secretary

at the time.  She was not Dog's wife and was not permitted to act on Dog's behalf.  Dog never

gave her such authority, and Krutonog would have had no reason to believe that Beth was Dog's

agent. (Beth Decl. ¶ 10; Dog Decl. ¶ 17; Ex. D (Beth Dep. vol. I) at 37:13–21.)  In fact,

Krutonog could have presented the financial breakdown to Dog instead of Beth, but he chose not

to, presumably because he knew Dog would never have approved a deal that would have taken money away from Dog, Beth and their children.

**D.**      **Krutonog Breached His Contract by Failing To Fulfill His Duties as the Chapmans' Manager, and as a Result, Krutonog Was Terminated.**

Sometime in 2006, Krutonog became complacent in his role as the Chapmans' manager, he started doing less and less work in connection with the Program, and failed to adequately manage or even communicate with the Chapmans as he was required to under the terms of his contract. As a result, on July 20, 2006, Mr. Houts sent an email to Krutonog in which Mr. Houts expressed, in no uncertain terms, that Krutonog's "behavior is unacceptable." (Ex. 21; Ex. H (Houts Dep.) at 227:7–11, 229:14–25.) Mr. Houts' email continued: "The management of the Chapmans' relationship with the production and the network is *of the essence of your co-executive provider services*. By not communicating with the Chapmans, you are effectively denying the series an essential element of the services we contracted for." (Ex. 21 (emphasis added).) Mr. Houts demanded that Krutonog immediately "take all necessary steps to restore [his] relationship with the Chapmans," and resume his "services to the series." (Ex. 21.)

Krutonog failed to heed Mr. Houts' warnings. In fact, Krutonog's behavior further deteriorated to the point that he stopped showing up on the set altogether. After months of Krutonog shirking his responsibilities, Dog finally confronted him and warned him that he would be fired if he did not satisfy his management obligations. (Dog Decl. ¶ 18.) Specifically, Dog explained to Krutonog: "You better show up or you're going to get fired . . . . You don't get paid [to do] nothing." (Ex. F (Dog Dep.) at 210:4–6, 210:18–19.) Dog testified that he "tried to talk [Krutonog] into staying there with [them] to work, but he wouldn't. And he just—he just split. He . . . left [Hawaii] in the middle of the morning without saying goodbye. Jumped on a plane and took off . . . ." (Ex. F (Dog Dep.) at 210:24–211:2.) In addition to Dog giving

Krutonog "several chances" (Ex. F (Dog Dep.) at 211:23–24), Beth also attempted to get

Krutonog to satisfy the terms of his contract. (Beth Decl. ¶ 13.)  At deposition, Krutonog

implausibly denied that the Chapmans requested that he return to the set in Hawaii, but admitted

that he refused to appear on set between August 31, 2006 and September 14, 2006. (Ex. K

(Krutonog Dep. vol. II) at 497:9–16, 498:3–15.)

When Krutonog still failed to fulfill his management responsibilities, Mr. Houts sent him

the following email on September 7, 2012:

> Please be formally advised that you are not now providing
> acceptable services to D&D . . . (including but not limited to the
> fact that at this time you are not managing in any manner the
> relationship between the Chapmans and the production).  We
> expect you to remedy this situation immediately and to commence
> providing services that we deed acceptable.  The first step to that
> end is your joining the production on location in Honolulu. . . . *If
> you do not comply as directed, D&D . . . will have no recourse
> but to consider remedial action, up to and including dismissal*.

(Ex. 27 (emphasis added).)  Mr. Houts explained that he "thought some of [Krutonog's] conduct

was in breach of the agreement," and he intended to put Krutonog on formal notice of that breach

and give Krutonog an adequate opportunity to cure. (Ex. H (Houts Dep.) at 297:1–2, 298:6–11,

303:22–23 ("I sent this letter to Mr. Krutonog asking him to fix a problem.").)  Mr. Houts further

testified that he never withdrew his directive, or sent a follow-up email informing Krutonog that

he was "in compliance" with his contractual obligations. (Ex. H (Houts Dep.) 304:23–305:10.)

On September 12, 2006, while Krutonog was still in breach of his contract and refused to

provide management services to the Chapmans, Mr. Abell, on behalf of the Chapmans, sent

Krutonog a formal termination letter. (Ex. 24.)  The letter stated: "Effective immediately, your

services and all contracts between you, Duane Chapman, Dog TBH Corp, Dog The Bounty

Hunter and all of their related entities are hereby terminated. . . . *The termination hereunder is*

*based on your material breach of said Agreements*." (Ex. 24 (emphasis added).)  As Mr. Abell

testified, "My intention was to terminate [Krutonog] from any agreements of which [the

Chapmans] had a right to terminate him and so I tried to make it as broad as possible

because . . . they did not want him to be part of their lives any longer." (Ex. B (Abell Dep.) at

78:1–6.)  To clarify that the Co-Executive Producer Agreement was also being terminated,

Mr. Abell sent a copy of the termination letter to Mr. Houts at D&D, and testified that he

"wanted to let Mr. Houts know that [Krutonog] was being terminated in all capacities including

agent, producer, partner, manager or any representative for the Chapmans." (Ex. B (Abell Dep.)

at 304:16–305:5, 305:22–23.)  On October 12, 2006, Mr. Houts confirmed D&D's position

regarding Krutonog's breach in another email to Krutonog:  "There is nothing groundless or

outrageous in D&D seeking to rely on its contractual rights and to have certain services

performed in accordance with the terms of its agreement with you." (Ex. 28 at D&D000625.)

### E.  Plaintiffs Filed This Interpleader Action To Resolve the Parties' Competing Claims to the Monies on Deposit with the Court.

In January 2007, Plaintiffs ceased all payments to Krutonog under his purported Co-

Executive Producer Agreement.  On March 26, 2007, the Chapmans filed a Petition for

Determination of Controversy with the California Labor Commissioner (the "Petition"),

asserting, among other things, that Krutonog and Pivot Point acted as unlicensed talent agents in

soliciting employment for the Chapmans, which is prohibited under the TAA.  (Brettler Decl.

¶ 31 & Ex. R.)  Among their prayers for relief, the Chapmans asked the Labor Commissioner to

declare the so-called "Life Rights Agreement" null, void and unenforceable, and prevent

Krutonog and/or Pivot Point from receiving any further management commissions previously

paid by AETN under the Co-Executive Producer Agreement.  (Ex. R at 6–7.)  The Labor

Commissioner, who has exclusive jurisdiction over these issues, has not yet issued a decision on the Chapmans' Petition. (Brettler Decl. ¶ 31.)

Shortly after the Chapmans filed their Petition, they demanded that AETN pay them all monies that were previously earmarked for Krutonog and/or Pivot Point under the Co-Executive Producer Agreement, considering that those monies were meant to compensate Krutonog for management services that he failed to perform. (Ex. 63 at AETN001590–92.) Then, in May 2008, Krutonog and Pivot Point sued Plaintiffs and Mr. Houts in New York Supreme Court for refusing to pay Pivot Point the management commissions that were allegedly due under the Co-Executive Producer Agreement. (*See* King Decl. Ex. UU at 11–12.) Following Krutonog and Pivot Point's state court filing, Plaintiffs agreed to amend Dog's 2005 Deal Memorandum, as of November 17, 2008, to provide that

(Dog Decl. Ex. 48 at AETN000827, ¶ 3 (emphasis added).) AETN's General Counsel, Douglas Jacobs, testified that this contract amendment

(Ex. I (Jacobs Dep.) at 65:11–19.)

In the meantime, Krutonog continued his litigious streak by filing a malpractice lawsuit in Los Angeles Superior Court against his former transactional attorneys, including Les Abell and Mr. Abell's law firm. (Ex. 79.) In his malpractice action, Krutonog alleged that his counsel poorly advised him regarding the TAA. Due to the bad legal advice he received, Krutonog asserted in his *verified* pleadings that could lose the right to collect management commissions,

and the Life Rights Agreement and the Co-Executive Producer Agreement could be deemed void

and unenforceable as a result of Krutonog running afoul of the TAA.  (Ex. 79 ¶ 8; Ex. S ¶ 11;

Ex. T ¶ 11.)  If Krutonog were truly only a producer of the Program, as he wants the Court to

believe, he would not have had any viable malpractice claim against his former attorneys because

the TAA would not have come into play or give rise to such claims.  Indeed, in response to

written discovery requests served in the malpractice action, to prevail on his claims Krutonog

was forced to admit that he violated the TAA by procuring work on behalf of the Chapmans

without being a licensed talent agent.  (Ex. 80 (Resp. to RFA No. 22); Ex. 81 (RFA No. 22).)  It

is believed that Krutonog recently settled the claims against his former lawyers and received a

significant settlement payout.

Faced with competing claims over the monies from the Chapmans, on the one hand, and

Krutonog and Pivot Point, on the other hand, Plaintiffs interpleaded the monies with this Court

[ECF No. 25 (Order granting interpleader relief)], permitting the Chapmans to establish their

lawful right to the interpleaded stake, which represents unlawful and unearned management

commissions that Pivot Point seeks to collect.

## III.   **ARGUMENT**

In deciding a motion for summary judgment, the Court must construe the evidence in the

light most favorable to the non-moving party and must draw all reasonable inferences in the

non-moving party's favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *In re*

*"Agent Orange" Prod. Liab. Litig.*, 517 F.3d 76, 87 (2d Cir. 2008).  Summary judgment should

be denied "if the evidence is such that a reasonable jury could return a verdict" in favor of the

non-moving party.  *NetJets Aviation, Inc. v. LHC Commc'ns, LLC*, 537 F.3d 168, 178–79 (2d

Cir. 2008).  Trial courts should act "with caution in granting summary judgment," and may "deny

summary judgment in a case where there is reason to believe that the better course would be to

proceed to a full trial." *Liberty Lobby*, 477 U.S. at 255 (citation omitted).

### A.   **The Court Must Deny Summary Judgment Because the Labor Commissioner Has Exclusive Jurisdiction Over Essential Matters Raised Here.**

Although, as explained above, the California Labor Commissioner has not yet ruled on

whether Krutonog and Pivot Point violated the TAA by operating as unlicensed talent agents, and

would therefore have to disgorge and forfeit all unlawfully obtained management commissions,

the Chapmans are informed that a decision from the Commissioner is imminent.  However, until

the Commissioner rules on the Chapmans' Petition, there cannot be a determination with respect

to the ultimate issue raised in Pivot Point's Motion—i.e., whether Pivot Point is entitled to any

portion of the monies that are on deposit with the Court.  California law governs the relationship

between Krutonog and Pivot Point, on the one hand, and the Chapmans, on the other hand.  This

Court must defer to the California Labor Commissioner to determine whether Krutonog and

Pivot Point violated the TAA, thereby forfeiting any right to receive management commissions.

*See Styne v. Stevens*, 26 Cal. 4th 42, 54 (2001) (holding that the California Labor Commissioner

has original and ***exclusive*** jurisdiction to hear and determine all issues of contract voidability as a

result of claims that a party acted as an unlicensed talent agent); *Buchwald v. Superior Court*,

254 Cal. App. 2d 347, 357 (1967) (same); *see also* Cal. Lab. Code § 1700.44 (all "cases or

controversies arising under" the TAA shall be initially decided by the Labor Commissioner).

The Chapmans asked the Labor Commissioner to invalidate the Life Rights Agreement

and the Co-Executive Producer Agreement on the grounds that Krutonog violated the TAA.

Here, Pivot Point is attempting to recover monies under those agreements.  Those monies would

represent payment of illegal management commissions to which Krutonog and Pivot Point are

not entitled under the TAA.  Krutonog already admitted that he violated the TAA by acting as an

unlicensed talent agent and procuring work on behalf of the Chapmans. (*See* Exs. 79–81.)
Accordingly, Pivot Point is not entitled to recover *any* management commissions from the
Chapmans no matter what the commissions are called. The Life Rights Agreement evidences an
intentional effort by Krutonog to disguise the payment of illegal management commissions as
producer fees. Specifically, paragraphs 1 through 5 of the Life Rights Agreement, provide that
Krutonog will receive a percentage "commission" on exploitation of Dog's books,
merchandising rights, video games, apparel, and spokesperson opportunities. (Dog Decl.
Ex. 102.) However, paragraph 6 of the Life Rights Agreement characterizes the payments to
Krutonog as being "producer fees," but *only* with respect to feature films and *television*
programs. (Dog Decl. Ex. 102.) Obviously, Pivot Point referred to its commissions as "producer
fees" as a crafty—but ultimately ineffective—way to avoid the constraints of the TAA. Now
Pivot Point is trying to make an end-run around the Labor Commissioner by moving for
summary judgment here before the Labor Commissioner issues its decision because Pivot Point
realizes the likelihood that the Commissioner will rule in favor of the Chapmans. Nonetheless,
to grant summary judgment, the Court would have to decide issues that are within the exclusive
purview of the California Labor Commissioner. Because the Court lacks jurisdiction to do so,
summary judgment is not appropriate—or even available—on the issues raised in the Motion.

**B.**      **The Court Cannot Resolve the Breach of Fiduciary Duty Issue on Pivot
            Point's Motion for Summary Judgment.**

Aside from the fact that the Court does not have jurisdiction to determine whether Pivot
Point violated the TAA, the Court is not able to resolve this dispute on summary judgment given
the numerous disputed factual issues involved in the Chapmans' breach of fiduciary duty claim
against Pivot Point. There exists not only the possibility, but the likelihood, that a jury hearing
evidence on that claim would return a verdict in favor of the Chapmans. Pivot Point largely

ignores the Chapmans' breach of fiduciary duty claims in its Motion, but whether Pivot Point is

entitled to any portion of the interpleaded stake is necessarily dependent on whether Krutonog

breached his fiduciary duties to his former clients.

As set forth in detail above, the Chapmans have raised factual issues regarding

Krutonog's breach of the fiduciary duty he owed to his clients.[4]  Among other things, Krutonog

breached this duty by: (i) secretly, and without the Chapmans' consent, adding a "life of the

show" provision in the Co-Executive Producer Agreement; (ii) refusing to disclose the terms of

the Co-Executive Producer Agreement to the Chapmans; (iii) negotiating a separate contract for

himself while still being paid out of the same pool of money that Plaintiffs allocated to Dog and

the posse; (iv) negotiating for an exclusivity fee even though his contract expressly stated that he

was not exclusive to the Program; (v) attempting to commission Beth's compensation even

though Krutonog did not allocate any proceeds to her; (vi) failing to present the network's initial

offer to the Chapmans because it did not provide a pay increase to Krutonog; and (vii) attempting

to tie pay increases for Krutonog to Dog's pay increases, making it much more expensive for

Plaintiffs to raise Dog's compensation.  (*See supra* Part II. B–D.)

In light of these outstanding factual issues, summary judgment is not appropriate.  This

Court has previously held that "comparison of a party's conduct with the fiduciary standard of

care is a question of fact."  *Cramer v. Devon Grp.*, 774 F. Supp. 176, 185 (S.D.N.Y. 1991)

(Leisure, J.).  In denying summary judgment, the *Cramer* Court concluded that a "court's only

role is to determine if a genuine issue of fact exists:  it cannot assume the role of the jury on a

---

[4]  The manager-talent relationship gives rise to a fiduciary duty. *See generally Marathon Entm't, Inc. v. Blasi*, 42 Cal. 4th 974 (2008).  Laurence Becsey and Rick Siegel, the two expert witnesses retained by the Chapmans and Pivot Point, respectively, agree on this point. (Ex. C (Becsey Dep.) 112:14–20; Ex. Q (Siegel Dep.) 150:4–18, 151:2–6.)

sensitive factual issue like fiduciary duty." *Id.* (citing *Liberty Lobby*, 477 U.S. at 249).  The

Chapmans are entitled to present their breach of fiduciary duty claim to a jury for the jury to

determine whether, and to what extent, Krutonog placed his own economic interests ahead of the

interests of the Chapmans.  If Krutonog had not breached his fiduciary duties to the Chapmans, a

reasonable jury could conclude that the Chapmans would have been able to negotiate a higher per

episode fee for themselves, and they would have saved millions of dollars in unlawful and ill-

gotten management commissions paid to Pivot Point.

**C.      The Chapmans Are Intended Third-Party Beneficiaries of the Co-Executive
         Producer Agreement, Which Pivot Point Breached.**

Despite Pivot Point's claim that the Chapmans are not parties to the Co-Executive

Producer Agreement, they clearly are third-party beneficiaries of that agreement by virtue of the

fact that Plaintiffs were paying Pivot Point and Krutonog to render services as the Chapmans'

manager in connection with the Program. *(See supra* Part II.A.)  As third-party beneficiaries of

the Co-Executive Producer Agreement, if the agreement is deemed null and void with respect to

enforceability by Krutonog and Pivot Point, the management commissions payable thereunder

must revert to the Chapmans who did not receive the benefit of the management services that

Krutonog and Pivot Point were being paid to provide.  As argued above, whether the Co-

Executive Producer Agreement is void *ab initio* with respect to Krutonog and Pivot Point, is the

subject of an action before the California Labor Commissioner.  Nevertheless, the Chapmans

have the right to assert a claim to the monies that would have been paid to Krutonog and/or Pivot

Point under the Co-Executive Producer Agreement because the Chapmans were intended

beneficiaries of that contract and did not receive the benefit of their bargain.  *Subaru Distribs.*

*Corp. v. Subaru of Am., Inc.*, 425 F.3d 119, 124 (2d Cir. 2005).  Monies that Krutonog siphoned

away from the ████████████████ would have otherwise gone to the Chapmans.

Pivot Point fails to confront the simple fact that the evidence irrefutably demonstrates that Krutonog had *no* obligation under the so-called Co-Executive Producer Agreement other than to fulfill his management duties to the Chapmans.  Not only were the Chapmans intended beneficiaries of the Co-Executive Producer Agreement because they were in privity with Krutonog (their talent manager), but also because "management of the Chapmans' relationship with the production and the network" was "of the essence" of the Co-Executive Producer Agreement.  (Ex. 21.)  Pivot Point's Motion entirely ignores that essential fact concerning the parties' intention to confer a benefit on the Chapmans.  *Subaru Distribs.*, 425 F.3d at 124.

The language contained within the four corners of the Co-Executive Producer Agreement confers a third-party benefit on the Chapmans.  The contract expressly states: "Krutonog shall render such executive producer services as requested by Hybrid . . . ."  (King Decl. Ex. 7 ¶ 4.) No witnesses in this case were able to define what "executive producer services" entailed, however, Mr. Houts, a producer of the Program, informed Krutonog that his service as the Chapmans' manager was "of the essence" of the Co-Executive Producer Agreement.  (Ex. 21.) In addition, Mr. Cohen, a representative of the network, testified that Krutonog's job was to "wrangle the talent," meaning that his responsibility was to manage the Chapmans and act as a liaison between the Chapmans and the production.  (Ex. G (Cohen Dep.) at 13:6–15.)

Contrary to Pivot Point's assertion, the Court *is* permitted to look outside the four corners of the contract when determining whether the contracting parties intended to benefit a third party. Even the court in *Debary v. Harrah's Operating Co.*, 465 F. Supp. 2d 250 (S.D.N.Y. 2006), the case upon which Pivot Point so heavily relies, notes that reliance on extrinsic evidence may be permissible, and that the stringent "four corners" requirement that Pivot Point argues should be applied is subject to "considerable dispute concerning whether it is appropriate to consider

extrinsic evidence regarding third-party beneficiary status." *Debary*, 465 F. Supp. 2d at 263

(citation omitted).  More recently published New York state court decisions appear to favor an

approach whereby extrinsic evidence is examined in a third-party beneficiary analysis.

      For example, earlier this year the New York Appellate Division found that a party was

not entitled to summary judgment on its breach of contract claim on the grounds that the

opposing party presented triable issues of fact regarding its status a third-party beneficiary even

though that party was not mentioned in the contract. *Logan-Baldwin v. L.S.M. Gen. Contractors,*

*Inc.*, 94 A.D.3d 1466, 1470 (2012).  In reaching its conclusion, the Appellate Division examined

extrinsic evidence regarding the third-party beneficiary issue. *Id.* ("[A]n express contractual

provision concerning third-party beneficiaries is but an ***alternative factor*** upon which a court

might base a finding that a certain party is, in fact, a third-party beneficiary.") (emphasis added)

(citation omitted).  The *Logan-Baldwin* Court noted that "[a]n obligation rooted in contract

may . . . engender a duty owed to those not in privity when the contracting party knows that the

subject matter of a contract is intended for the benefit of others . . . ." *Id.* (citations omitted); *see*

*also Key Int'l Mfg., Inc. v. Morse/Diesel, Inc.*, 142 A.D.2d 448, 457 (1988) (reversing trial

court's grant of defendant's motion for summary judgment for breach of contract on grounds that

factual issue existed as to whether plaintiff was in privity with defendant even though plaintiff

was not mentioned in the contract).

      In addition to the *Logan-Baldwin* holding, ample authority provides that the Court should

consider evidence outside of the four corners of the Co-Executive Producer Agreement to

determine whether the Chapmans were third-party beneficiaries of that agreement.  It is well-

settled law in this Circuit that a court may look at the surrounding circumstances as well as the

agreement in conducting its analysis. *Trans-Orient Marine Corp. v. Star Trading & Marine,*

*Inc.*, 925 F.2d 566, 573 (2d Cir. 1991); *Septembertide Pub., B.V. v. Stein & Day, Inc.*, 884 F.2d

675, 679 (2d Cir. 1989) ("we must examine the intent of the parties—as revealed in their

agreement—and the surrounding circumstances"); *see also Aievoli v. Farley*, 223 A.D.2d 613,

614 (1996). "[T]he obligation to perform to the third party beneficiary need not be expressly

stated in the contract." *Trans-Orient*, 925 F.2d 573; *Vista Co. v. Columbia Pictures Indus., Inc.*,

725 F. Supp. 1286, 1296 (S.D.N.Y. 1989); *see also Aievoli*, 223 A.D.2d 614.

      As set forth above and in the supporting papers concurrently filed herewith, the

Chapmans have identified extensive documentary evidence and deposition testimony of

numerous witnesses demonstrating that the parties intent when entering into the Co-Executive

Producer Agreement was to benefit the Chapmans by providing a mechanism for Krutonog

and/or Pivot to be paid management commissions by the network and/or producers rather than by

the Chapmans directly. Regardless of the fact that those management commissions were

disguised as "co-executive producer fees," it is clear that the ***only*** reason Plaintiffs paid any

money to Krutonog and/or Pivot Point was because Krutonog served as the Chapmans' manager

and acted as a liaison between the Chapmans and the producers. (*See supra* Part II.)

### D.    The Chapmans Are Not Seeking To Enforce an Illegal Contract; They Are Seeking To Prevent Pivot Point from Enforcing It.

      Pivot Point disingenuously argues that the Chapmans are trying to enforce a contract that

they claim is void and unenforceable. In reality, the Chapmans are ***not*** suing on the Co-

Executive Producer Agreement. Instead, the Chapmans filed a claim to the interpleader stake,

and have asserted cross-claims against Pivot Point to ensure that Pivot Point and/or Krutonog do

not take monies that rightfully belong to the Chapmans. Because Krutonog violated the

provisions of the TAA, breached his fiduciary duties to the Chapmans, and failed to provide

management services to the Chapmans as required under the Co-Executive Producer Agreement,

Krutonog can take nothing from Plaintiffs at the Chapmans' expense.  Pivot Point's arguments

that the Co-Executive Producer Agreement was never properly terminated, that the Chapmans or

D&D never fired Krutonog, that Krutonog never received adequate notice to cure his breaches,

and that Plaintiff allegedly abandoned its defenses are belied by the facts, but in any event are red

herring issues designed to distract the Court from what is really at stake:  Over the approximately

twelve years that Krutonog worked with Dog, Krutonog enriched himself through the receipt of

substantial commissions from the work procured for the Chapmans.  Krutonog developed

nothing and provided no value to the Program other than to serve as the Chapmans' manager and

act as a liaison between the Chapmans and the producers of the Program.  Krutonog violated the

TAA, breached his fiduciary duty to the Chapmans, and failed to perform under the Co-

Executive Producer Agreement.  As a result, he is not entitled to recover any portion of the

interpleaded funds.  *See Terry v. Bender*, 143 Cal. App. 2d 198, 213 (1956) (an agent's serious

breach of fiduciary duty will defeat the agent's right to compensation).  Even Pivot Point's own

expert witness confirms this interpretation of the contract at issue.  (Ex. Q (Siegel Dep.) at

262:11–14 (testifying that Krutonog's contract could be terminated if it were breached regardless

of the fact that it contained a so-called "pay-or-play" provision).)    This principle is particularly

true where, as here, the agent has surreptitiously stolen or hidden commissions from his client.

*Jarvis v. O'Brien*, 147 Cal. App. 2d 758, 759 (1957); *Terry*, 143 Cal. App. 2d at 212 ("A

faithless agent must disgorge to his principal the secret profits and unauthorized benefits and

advantages he has acquired as an outgrowth of agency."); *see also Cnty. of San Bernardino v.*

*Walsh*, 158 Cal. App. 4th 533, 543 (2007) (finding that disgorgement of profits is particularly

applicable in cases dealing with breach of a fiduciary duty).  Where a person profits from

transactions conducted by him as a fiduciary, the proper measure of damages is full disgorgement

of any secret profit made by the fiduciary regardless of whether the principal suffers any damage.

*Walsh*, 158 Cal. App. 4th at 543.

## IV.   **CONCLUSION**

For the reasons set forth herein and in the accompanying supporting papers, the Court should deny Pivot Point's Motion for Summary Judgment against the Chapmans.  The numerous disputed issues of material fact regarding the Chapmans' claim for breach of fiduciary duty alone preclude entry of summary judgment here.

DATED:  Los Angeles, California
            August 24, 2012

LAVELY & SINGER
PROFESSIONAL CORPORATION

          s/ Andrew B. Brettler
Martin D. Singer (*pro hac vice*)
   mdsinger@lavelysinger.com
Paul N. Sorrell (*pro hac vice*)
   psorrell@lavelysinger.com
Andrew B. Brettler (AB2662)
   abrettler@lavelysinger.com

2049 Century Park East, Suite 2400
Los Angeles, California  90067
Telephone:  (310) 556-3501
Facsimile:  (310) 556-3615
*Attorneys for Defendants/Cross-Claimants*
Duane "Dog" Chapman and Beth Chapman