UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| A&E TELEVISION NETWORKS, LLC, a Delaware limited liability company; and D&D TELEVISION PRODUCTIONS, INC., a New York Corporation,<br><br>     Plaintiffs,<br><br>    -against-<br><br>PIVOT POINT ENTERTAINMENT, LLC, a California limited liability company; DUANE CHAPMAN, an individual; and ALICE BARMORE-SMITH CHAPMAN, an individual,<br><br>     Defendants.<br><br>AND RELATED COUNTERCLAIMS AND CROSS-CLAIMS. | 10-CV 9422-AJN<br><br>**[REDACTED]**<br>**REPLY MEMORANDUM OF PIVOT POINT ENTERTAINMENT, LLC ON MOTION FOR SUMMARY JUDGMENT AGAINST DUANE "DOG" CHAPMAN AND BETH CHAPMAN**<br><br>**[Proposed Order Annexed]**<br><br>Action Filed:  December 17, 2010 |

TO ALL PARTIES AND TO THEIR ATTORNEYS OF RECORD:

3533.063/589456.1

## I.   INTRODUCTION

There is no evidence that entering into the separate Krutonog - Hybrid agreement in 2003 "was a subterfuge to disguise the payment of 'illegal management' commissions in a transparent effort to prevent the Chapmans from controlling Krutonog's compensation even though he worked for them and was to be their manager," or to circumvent the TAA, or that Krutonog was even aware of the TAA or its provisions.  It is demonstrable that under all the projects Krutonog worked on involving Dog, Krutonog was to be **a producer,** not a manager.  See, e.g, Exs' "JJ" and "KK" (deal with Lighthearted); Krutonog Reply Decl. ¶8; King Reply Decl.¶8 (and accompanying Exs.).

While Chapmans insist Krutonog was their manager in a failed effort to create a fiduciary duty, there is no evidence of a management agreement, that he was an employee of Dog or Beth (no W-2 or W-4), or that Dog (or Beth) ever paid him any commission.  The fiction that Dog paid a commission to Krutonog as manager for Seasons 1 and 2 of the Series, was demonstrated to be absolutely false in Pivot's moving papers.  Beth admitted in deposition – contrary to what she says in declaration -- that Krutonog was never her manager.  Exhibit "U," p. 918:25-919:9. Dog could not keep his story straight regarding what Boris' commission was "some percentage 7, 10, 15, 20 percent off what I made as his commission."  Later he says it started at 10, then was raised to 12, then to 14 percent.  Reply Ex. "KKK"  At the DLSE, he said he had no idea if a percentage of Dog's money was paid to Krutonog. King Reply Decl. ¶12(d).

Similarly, the Chapmans point to no scrap of paper purporting to memorialize a management <u>agreement</u> between Dog and Krutonog or Pivot.  All the <u>**documentation**</u>, including the LSOA (Ex. "1" and LRA (Ex. "102") (with their respective merger and integration clauses), the COEP Agreement (with its amendments), and the prior project contracts and deal memos (e.g., Exs. "JJ", "KK") manifest Krutonog's role as producer, not manager.  Dog was adamant at

the DLSE that Krutonog did not procure the Hybrid deal. Ex. "III", p. 1821:13-1822:7; King Reply Decl. ¶12(b).

The Chapmans have no direct claim to the COEP funds. Beth has no claim, period, as she has no standing and no tenable damages.[1]  In effect they seek an unbonded writ of attachment for the day when, if at all, they might convince the Labor Commissioner, that there is some violation of the TAA.  There is no evidence that if the money Hybrid/D&D/AETN paid/owes to Pivot for Seasons 1 and 2, or for Seasons 3 and later, would have been paid to the Chapmans if Krutonog and Pivot had not negotiated their separate COEP contracts with Hybrid, D&D and A&E.  In addition, Plaintiffs point out that No. 5 to Dog's 2005 contract only commits Plaintiffs that to be redistributed to the Chapman parties, at most some ███████ (for a limited scope of royalties) if a Court determines the same are not due to Pivot.

## II.   THE CHAPMANS FAIL TO RAISE RELEVANT TRIABLE ISSUES OF FACT

The Chapmans fail to controvert what they themselves postulated when opposing leave to file the subject motion:  The relevant parties' relationship is defined in two written agreements -- with integration clauses -- under which Krutonog is not a manager.  They also fail to controvert that they **and their lawyer** knew Krutonog/Pivot had their own contract, what Krutonog/Pivot were getting paid under the original contract and under Amendment No. 3 (including percentage royalties for Videograms and Off Network Exploitation).[2]

---

[1] She was not a party to any LSOA.  The Chapmans speak of the ████████ "Dog's pot" in 2005; it was never "Beth's pot." Nowhere do Chapmans argue, much less establish, that the September 12, 2006 "termination" was on her behalf.  She approved the "split" with Pivot by her Oct 27, 2005 e-mail and ratified it when Abell sent later correspondence and when she and Dog signed the final contracts. Certainly her Cross-Claims should be dismissed.
[2] The Chapmans do not even address Pivot's evidence on these matters.

**A.**     Beth Handles All the Money and the Money Questions

The Chapmans disingenuously try to pass off Beth as being but a mere secretary to Dog, with no standing to speak for Dog. They try to wriggle out from her Oct. 27, 2005 approval (Ex. "4") of the split of ███████ – with ███████████ going to Pivot – with a silly story that she was not really approving anything, and was using the matter as a point to demonstrate to Dog that Krutonog was victimizing Dog. That story falls apart when considering (a) her Jan. 9 2012 testimony that she told Dog that Pivot's money was coming from "Dogs Pot,"[3] (b) all the correspondence thereafter – including from Les Abell (e.g., Ex. "65"), and (c) the various contracts confirming that the split of the ██████ must include ████ to Pivot.[4] The evidence, including Dog's own testimony, demonstrate that it was Beth, not Dog, who handled financial affairs for him.[5] She was not merely a secretary. Beth testified that after she sent her Oct. 27, 2005 e-mail she tried to convince Dog that Krutonog was stealing "Dog's pot," but Dog would not agree with her. Ex. "W".[6]

**B.**     There is No Evidence that Pivot was Terminated by Plaintiffs

Chapmans fail at their contention that Pivot was terminated by Plaintiffs – or by the Chapmans. The references to July 20, 2006 and Sept. 7, 2006 (Ex. "28") Houts' e-mails do nothing to establish that Pivot was terminated by Plaintiffs. The Chapmans omit Krutonog's responses attached to his Reply Decl. Exs. "28", "RB-XX", and "CCC."

---

[3] See Ex. "W" at pp. 584-588)

[4] The notion that Beth (or Dog) did not know the terms and amounts of the contracts with Duane Lee II, Leland and Tim Chapman, and thus could not know by simple arithmetic that Pivot was receiving its agreed share, is untenable. It ignores Ex. "65" and the other correspondence. In addition, all the Chapman family 2005 contracts were sent to Abell. See Ex. "BBB" (Dec. 13, 2005 e-mail to Abell).

[5] Dog Depo. Trans. pp. 32; p. 56:23- 57:3; "I've told you all day, I don't deal with the money." 143:11-12" Dog DLSE Trans. (Beth handles all the money) Ex. "III".

[6] The Chapmans misportray the import of the December 12, 2006 e-mail from Alan Nevins (Exhibit "38" at AETN 01251) about Dog still claiming that he did not understand that Pivot's fees was part of the ████████; Nevins was incredulous over the implausible contention, as Beth must have been, given her arguing with Dog over it.

**C.**     The Chapmans Twist the issue of the ██████ proposal

In an effort to invent a breach of fiduciary duty, Chapmans twist the Oct. 19, 2005 effort

by AETN to disguise increased payments to Dog as "reimbursement" as part of a new ██████

package, into being a non-disclosure by Krutonog in breach of a supposed fiduciary duty.  Opp.

p. 2;8-9] The portrayal is untenable.  The testimony clearly shows that after Beth was aware of

the ██████ proposal, she told Krutonog "now go get yourself a f***ing... raise" Krutonog

Trans. p. 641:5-642:13. Ex. "LLL", thereafter AETN's offer was raised to ██████, to "include

Boris's as it might be determined." Ex. "LLL". AETN made the Chapmans aware of the

██████ offer – asking that they not tell Krutonog – on October 19, 2005. Ex. "13". So the

Chapmans cannot say Krutonog withheld anything from them – they and their attorney knew of

the offer.

**D.**     Chapmans Aware of the Amount Paid to Krutonog Under Original Contract

The Chapmans and their attorney Les Abell were aware of the material terms of

Krutonog's contract in the negotiations in 2003.  The drafts of the contract between Dog and

Hybrid initially included provisions for Krutonog to be paid ██████ – the very same amount

that is called for in Krutonog's  initial 2003 COEP Agreement . See Reply Ex. "AAA" (Dec. 13,

2003 draft). The Chapmans argue that "the Program's producers did not attempt to inform Beth

or Mr. Abell about the monies that Krutonog was to receive under his 2003 agreement nearly a

year after the agreement was finalized." They knew it from the draft of Dog's contract.  They

knew from prior deals, that Krutonog would be attached to all iterations of the show.  Krutonog

Reply Decl., Ex. "RB-R ¶4" (King Reply Decl. ¶18.)

**III.** THE CHAPMANS ARE NOT CONTRACT PARTIES OR THIRD PARTY
BENEFICIARIES

The Chapmans fail to address applicable New York law cited by Pivot establishing that

the Chapmans are not parties to the contracts, nor intended third party beneficiaries entitled to

sue under the 2003 COEP Agreement or its iterations.  The few cases they cite do not address

these issues or the *Debary* case.  The Chapman Cross-Claims allege breach of contract as if the

Chapmans are in privity, which of course they are not. The Second Claim, "For Illegality," is not

a cause of action and is merely a corruption of an affirmative defense only a contract **party**

**being sued for** breach of contract may raise.

**IV.** THE TAA ISSUES ARE SEVERABLE, AND BY THE CHAPMANS'
CONTENTION, SUBJECT TO THE EXCLUSIVE ORIGINAL JURISDICTION
OF THE LABOR COMMISSIONER, YET, THERE IS NO REASON
TO WAIT UNTIL THE COMMISSIONER RULES

The only issue before the Labor Commissioner is whether Krutonog or Pivot acted as

unlicensed talent agent in **procuring** employment, and whether as a remedy, the Commissioner

may order disgorgement of payments made within one year of filing the petition. It is not a

plenary proceeding to adjudicate all issues and disputes between Krutonog/Pivot and the

Chapmans, and does not serve to adjudicate whether there was a breach of fiduciary duty or a

breach of a contract. The Chapmans blithely assume that they will be victorious as to all matters.

Yet they ignore important matters:

(a) As announced by the California Supreme Court (its highest court) after the

Chapmans filed their petition, the Commissioner must consider severability. *Marathon*

*Entertainment, Inc. v. Blasi*, 42 Cal. 4th 974 (2008).  No longer is *any* violation of the TAA

grounds for voiding all transactions affecting an artist and an alleged unlicensed talent agent, as

seems to be the drift of appellate decisions before the *Marathon* case.  So if Krutonog (not Pivot)

violated the Act in 2006 in arranging for Krutonog to appear in "PowerLock" commercials, that

does not mean all his dealings affecting Dog are invalidated.  See King Reply Decl. ¶10; Ex. "FFF."

(b)     A member of a group – in this case Krutonog as a member of the broader Dog "Posse may participate in negotiating on behalf of himself and the group, without any violation of the TAA. *Bautista v. Romero*, TAC 3-04 (2005); *Ray Leonard v. Rebney*, TAC 23-04 (2004); See also *Bixby v. Capomazza*, TAC 37-03 (2005) (if putative producer actually had served as producer, negotiations on his own behalf that also involve artist's services would not violate the Act; *The Stein Agency v. James Trip – Haith*, TAC 46-05 (2006), p. 5 n.2. (Producer is an "artist" under the Act.);

(c)     the Chapmans continue to flout their representation to the Court on January 5, 2010 that there is no reason to stay this action pending a Labor Commissioner decision.

(d)     Krutonog did not "admit" that he violated the TAA by procuring employment for Dog regarding the DTBH series[7] to appear in PowerLock commercials in 2006 (resulting in a ███████, it was unrelated to the DTBH Series, or the COEP, and thus would not result in disgorgement

(e)     The Chapmans misstate the evidence when they contend that AETN/D&D agreed they "will divide among the Chapmans the amount 'previously payable' to Krutonog," citing to

---

[7] Contrary to the Chapmans' portrayal, Krutonog did not admit to a violation of the TAA regarding the DTBH show in the malpractice action against Krutonog's counsel from before 2007.  The complaints (Exs "S" and "T" to Brettler Decl.) merely allege that by failure to warn Krutonog of the implications of the TAA, they opened him up TO expensive litigation in the DLSE where the Chapmans claim a violation over the TAA, and are using that claim for the improper purpose of holding up (so far successfully) payment to all that is owed by D&D/AETN.  The only admission he made about a TAA violation—an admission only for purposes of a request for admission in the malpractice case and not binding for purposes of other actions is that there may have been a 2006 violation in connection with Krutonog's involvement in efforts to line Dog up to be a commercials spokesman for "PowerLock" – a lock device.  For his involvement, Krutonog received only $5,000. See Ex. "FFF" (Respondents' Closing Brief in DLSE), pp.16-17.  That is wholly unrelated to the DTBH Show, and severable from the COEP issue under *Marathon, supra*.  Any admission of a request for admission in the California case is only an admission for the purposes of that case alone. Cal. Code of Civ. Proc. Section 2033.410.  There is no collateral estoppel effect from that action, which was settled and dismissed, *Jackson v. Co. of Los Angeles*, 60 Cal. App. 4th 171, 183 (1997)

an amendment to Dog's 2005 Deal Memo. Opp. p. 15. Yet AETN/D&D point out that the scope of what the Chapmans stand to be given by AETN/D&D is at most ▉▉▉. See Plaintiffs' Opp. Memo to MSJ against Plaintiffs(Dkt 139), p. 4, f.n. 3.[8] As Plaintiffs' point out, the Chapmans are not entitled to the entirety of the interpleaded funds – whether that be the nearly $4 million deposited, or the lesser figure Plaintiffs contend is due (same as $1.6 million less).

## V.   THE CHAPMANS MISCHARACTERIZE THE LRA

The LRA does not state, as Chapmans characterize it (Opp. p. 17) that Krutonog will receive "*management* commissions" on exploitation of Dog's books, merchandising, video games, apparel, and spokesman opportunities." The agreement spells out different *percentages* of revenues received from different forms of exploitations other than the DTBH series. None of such payments is even conceivably a violation of the TAA. As to television or movies, it provides that Krutonog shall be attached as a producer – not as a manager—just like in the transaction with CBS and Lighthearted Entertainment. It bears repeating, the LRA contains an integration clause, which bars rewriting the transaction. The Chapmans do not deal with that insurmountable obstacle.

## VI.   THE CHAPMANS' FAIL TO CONTROVERT MATTERS IN PIVOT'S RULE 56.1 STATEMENT WITH THE REFERENCE TO EXTRANEOUS AND IRRELEVANT MATTERS

The Chapmans "deny" numerous facts set out in Pivot's Local Rule 56.1 Statement, yet fail to cite supporting evidence regarding such facts. In many such circumstances, the Chapmans litter the record with citation to argument, or in some instances, to extraneous or irrelevant testimony and factual matters. Failure to deny or the denial coupled with failure to cite to

---

[8] "The Chapman Defendants also falsely claim Plaintiffs agreed to pay the Overpayment [the amount deposited AETN contends is not owed] to the Chapman Defendants based on their interpretation of Amend No. 5 to Dog Chapman's Deal Memorandum. Chapman Memo at 6. However, the Chapman Defendants omit from the quoted section that Amendment No. 5 was limited to 'monies relating to exploitation of the Series in broadcast syndication in the United States.' As shown above (p.2), that amount is less than ▉▉▉▉"

controverting evidence as required under Local Rule 56.1(d) renders such matters admitted. *Gubitoso v. Kapica*, 154 F.3d 30, 31 n.1 (2ᵈ Cir. 1998) (finding former Local Rule 3(g) to be equivalent to current Rule 56.1(c)); *Risco v. McHugh*, 10 Civ. 6314, 2012 U.S. Dist. LEXIS 83002, at *2 n. 2 (S.D.N.Y. June 14, 2012) ( Rule 56.1 responses that interjects arguments and/or immaterial facts in response to facts asserted by Defendant, without specifically controverting those facts" are to be deemed admissions of the stated fact; n. 2 discusses underpinning law).[9] For example, ¶¶ 8 and 9 of Pivot's Statement states that Krutonog was never an employee of Dog or Beth.  While the Chapmans "deny" those statements, they cite to no evidence that supports a contention that he was an employee.  No evidence of an employment agreement, a W-2 or W-4 form, or payment by the Chapmans is offered.[10]

    **A.**    Re the "non-exercise of the option"

    The Chapman's argument that Krutonog never exercised the option granted to him under the LSOA is misplaced and irrelevant.  Krutonog held the option to exploit Dog's life story, and because of his "foothold" on those rights, Hybrid and AETN could not exploit those rights without clearing title to those rights.  Steven Sadicario, Hybrid's agent, was told of Krutonog's rights (see Krutonog Decl; Ex. "53" [Sadicario 12/8/03 notes], which is why Hybrid gave Krutonog a contract for a Co-Executive Producer that AETN's Neil Cohen or was it Doug Jacob's of AETN a largely "honorific" according to AETN testimony.  Indeed, Beth

---

[9] Further, a party cannot create a "genuine" issue of "material" fact simply by making assertions in its legal memoranda. *Metalex Corp. v. Uniden Corp. of America*, 863 F.2d 1331, 1337 (7ᵗʰ Cir. 1988) ("argument is no substitute for evidence").

[10] Similarly, Sep. Stmt.¶4 refers to pre-December 2003 proposals for exploitation of Dog's life story under which Krutonog was to serve as Executive Producer, and be attached for life of the Show.  The very exhibits Pivot cites ("JJ" and KK")  were prepared by Abell (Ex. "JJ"), or sent to Abell (Ex. "KK"). Yet Chapmans argue that Pivot has pointed to no evidence that Dog's counsel were aware of contract provisions attaching himself to Dog's projects "for life." They even argue – incredibly – that Dog was not aware that Abell also represented Krutonog – despite Dog having signed conflict waiver letters (e.g., Ex. "EEE" to Krutonog Reply Decl.)

acknowledged that it was Krutonog's option rights that gave him the ability to insist upon a contract. King Reply Decl.; Ex. "MMM". No well-represented production company or distributor would proceed with production without avoiding any such "chain of title" issue.

> **B.** The False Claim That Krutonog Could Never Describe His Production Activities.

The Chapmans falsely claim that Krutonog could never explain what his production duties were. Yet he testified at length in proceedings to which the Chapmans were party regarding what he did. Exhibit "JJJ" to the King Reply Decl. compiles copious testimony from the DLSE on the subject.

> **C.** Pivot and Krutonog are Legally Distinct

The Chapmans cavalierly suggest that the distinction between Pivot and Krutonog should be disregarded. Yet there is no evidence to support ignoring the corporate distinction of the Pivot LLC from Krutonog, as required under New York. The COEP Agreement is between Pivot, D&D and AETN. The September 12, 2006 "termination" letter from Abell to Krutonog does not purport to be addressed to Pivot or mention the COEP Agreement, and there is no 10 day cure period given. There was no follow-up correspondence to say that cure was not accomplished. AETN/D&D admit that the contract was not terminated and they "have no claim to the Assets." Mere domination of a signatory for a corporation is not enough to impute the obligations of the corporation to the signatory officer. There must be a showing of misuse of the corporate form for personal ends, or "perversion" of the privilege of doing business in the corporate form. *TNS Holdings, Inc., v. MKI Securities Corp.*, 92 N.Y.2d 335, 340-41, 680 N.Y.S.2d 891, 893-94 (1998). Judicial action to disregard the corporate form is extraordinary. *Harrogate House Ltd. v. Jovine*, 2 A.D.3d, 767 N.Y.S.2d 613 (1st Dep't 2003) . The rights and obligations of Pivot and Krutonog therefore cannot be treated interchangeably as the Chapmans argue.

**D.** The Parol Evidence Chapmans Offer is Barred by the LSOA and LRA Integration Clauses

An integrated contract precludes extrinsic proof to add or to vary its terms. *Braten v. Bankers Trust Co.*, 60 N.Y.2d 155m 161-162, 468 N.Y.S.2d 861,864 (1983). The rule bars admission of antecedent or contemporary oral representations to add to the terms or of a purported promise not to enforce a condition. *Id., Sinclair Broadcast Group, Inc.*, 1995 WL 70577 (S.D.N.Y. 1995). The purpose of a merger clause is to require full application of the parol evidence rule to bar introduction of extrinsic evidence to alter, vary or contradict the terms of the writing. *Jarecki v. Shung Moo Louie*, 95 N.Y.2d 665, 669, 722 N.Y.S.2d 784, 786 (2001). Dog's tale that supposedly Krutonog told him that the LSOA and other contracts were of no consequence must be ignored. The Chapmans fail altogether to address the integration and merger clauses in the LSOA and the LRA, and their legal effect.

DATED:     September 24, 2012     KING, HOLMES, PATERNO & BERLINER, LLP


By:     /s/ Howard E. King
_____
HOWARD E. KING
KING@KHPBLAW.COM
STEPHEN D. ROTHSCHILD, ESQ.
ROTHSCHILD@KHPBLAW.COM
Attorneys for *Defendant/Counter-Claimant/Cross-Defendant PIVOT POINT ENTERTAINMENT, LLC*
1900 Avenue of the Stars, Twenty-Fifth Floor
Los Angeles, California 90067-4506
Telephone:     (310) 282-8989
Facsimile:     (310) 282-8903