UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: MAR 2 7 2013
```

------------------------------------------------------------

A&E TELEVISION NETWORKS, LLC, ET AL.,
                    Interpleader Plaintiffs,

         -v-

PIVOT POINT ENTERTAINMENT, LLC, ET AL.
                    Defendants.

------------------------------------------------------------X

           :
           :
           :
           :
           :
           :

10 Civ. 09422 (AJN)

OPINION AND ORDER

ALISON J. NATHAN, District Judge:

On December 17, 2010, Interpleader Plaintiffs A&E Television Network, LLC

("AETN") and D&D Television Productions, Inc. ("D&D") (collectively the "Plaintiffs"), filed

an interpleader complaint against Interpleader Defendants Pivot Point Entertainment, LLC

("Pivot Point" or "Pivot") and Duane and Alice Chapman (the "Chapmans"), requesting, *inter*

*alia*, that the Interpleader Defendants be required to interplead and settle their respective claims

to certain assets. (Dkt. No. 1) After Plaintiffs were granted interpleader and other relief, (Dkt.

No. 53), the Chapmans filed a crossclaim, (Dkt. No. 62), Pivot Point filed a counterclaim, (Dkt.

No. 64), and the Court now has before it three motions for summary judgment: (1) Plaintiffs'

Cross Motion for Summary Judgment, requesting dismissal of Pivot Point's Counterclaim, (Dkt.

No. 117); (2) Pivot Point's first Motion for Summary Judgment, requesting dismissal of

Plaintiffs' claims to a portion of the interpleaded fund, (Dkt. No. 133); and (3) Pivot Point's

second Motion for Summary Judgment, requesting dismissal of the Chapmans' Crossclaim and

judgment in Pivot Point's favor as to the entirety of the interpleaded fund, , (Dkt. No. 156). For

the following reasons, Plaintiffs' motion is granted in part and denied in part, Pivot Point's

motion against Plaintiffs is granted in part and denied in part, and Pivot Point's motion against
the Chapmans is denied.

## I.  BACKGROUND AND PROCEDURAL HISTORY

The Court assumes a general familiarity with the facts and history of the case, as
discussed in its memorandum opinion and order on January 18, 2011, allowing the interpleader
action to proceed, *A&E TV Networks, LLC v. Pivot Point Entm't, LLC*, No. 10 Civ. 9422, 2011
WL 182083 (S.D.N.Y. Jan. 18, 2011) (Gardephe, J.), Magistrate Judge Cott's March
memorandum and order on March 18, 2011, directing certain amounts that Plaintiffs were to
deposit into the interpleader fund, *A&E TV Networks, LLC v. Pivot Point Entm't, LLC.*, 771 F.
Supp. 2d 296 (S.D.N.Y. 2011) (Cott, M.J.), the Court's Order on May 26, 2011, directing
additional amounts that Plaintiffs were to deposit into the interpleader fund, (Dkt. No. 51
(Gardephe, J.)), and the Court's Order on July 15, 2011, granting interpleader relief to Plaintiffs,
discharging them of liability to Interpleader Defendants as to the interpleaded fund, and
enjoining Interpleader Defendants (and others) from asserting claims against them in an action or
proceeding to recover any or all of the interpleaded fund.  (Dkt. No. 53 (Gardephe, J.))
Notwithstanding this extensive history, because of the nature of the competing motions for
summary judgment currently before the Court, some recitation of the now-pertinent facts is
warranted.  Unless otherwise noted, the facts hereunder are uncontroverted.

On April 25, 2001, Boris Krutonog  ("Krutonog") and Duane Chapman ("Dog") signed
what is titled as a "Life Story Option Agreement," (Pivot Ex. 1), the validity and enforceability
of which the signees dispute.  On its face, the Life Story Option Agreement, although only
partially legible as submitted to the Court, purported to grant Krutonog "an exclusive option," for
a period of 36 months from the date of signing, "to acquire all theatrical and television motion

picture and ancillary and related rights (including television specials, dramatic and reality based television series rights but excluding the reserved rights hereinafter provided)."  (Pivot Ex. 1 ¶¶ 1-2)  As consideration, Krutonog offered (1) "[his] efforts to obtain a commitment for the development and production of motion picture and television projects based upon ["the incidents of [Dog's] life and any information and materials in connection [to it]]" and  (2) "the sum of One Dollar."  (Pivot Ex. 1 ¶ 1)   Along with other terms, the Life Story Option Agreement contained a choice of law and forum selection clause, which provided that it was to be governed by California law and that actions were to be brought in California courts or in federal courts in California.  (Pivot Ex. 1 ¶ 12)

In January 2004, Krutonog and Hybrid Films, Inc. ("Hybrid")[1] signed a document titled the "Co-Executive Producer Agreement" (the "COEP"), which, by its terms, was "entered into as of December 19, 2003." [2]  (Pivot Ex. 7)  In relevant part, the COEP provided the following:

> This Co-Executive Producer Agreement ("Agreement") is entered into as of December 19, 2003, by and among, HYBRID FILMS, INC. ("Hybrid") and Boris Krutonog ("Krutonog") with respect to Krutonog providing co-executive producer services ("Services") in the creation of a documentary television series based on the exploits of Duane "Dog" Chapman ("Chapman") bail bonding and fugitive tracking, hunting and capture primarily in Hawaii, California and Colorado (the "Business") and Chapman's life experiences in connection with the Business (which, together shall collectively be referred to herein as the "Property"). Hybrid and Krutonog shall sometimes be collectively referred to herein as the "Parties" and each, a "Party".

> In consideration for the Services to be provided by Krutonog hereunder and Hybrid's efforts to develop the Property and to arrange for the financing, production and distribution of a documentary television series of at least six (6)

---

[1] Hybrid is a production company that produces documentary reality television, including "Dog the Bounty Hunter." (Pls.' SMF ¶ 10)  In 2005, Hybrid created D&D as a special purpose corporate entity for the purpose of producing the series.  (Pls.' SMF ¶ 23)

[2] At the same time, Krutonog and Hybrid also signed an additional document titled the "First Amendment to Co-Executive Producer Agreement," which, although signed at the same time, was "entered into as of December 21, 2003."  (Pivot Ex. 8)  The amendment added a single paragraph, "Expiration of Network Agreement," made "[n]o other changes, modifications, or amendments" to the COEP, and provided that the COEP was to "remain in full force and effect."  (Pivot Ex. 8)

hour-long episodes . . . (the "Series") based on the Property (a "Production"), the Parties agree as follows:

1.  Conditions Precedent.  All of Hybrid's obligations hereunder are subject to and conditioned upon Hybrid entering into an agreement with a cable or broadcast television network (a "Network") to finance and produce such Production ("Production Agreement").

2.  Compensation.
    A. For the first order of 6 (six) hours . . . of production of the Series (which shall be guaranteed under any Production Agreement) Krutonog shall be paid by Hybrid the following amounts:  [episode specific pay information].
    B. For the next order of between thirteen (13) and twenty-four (24) hours . . . of production of the Series associated with the exercise of Chapman's Second Option by Hybrid (which is subject to Hybrid entering into an appropriate Production Agreement for such additional production) Krutonog shall be paid by Hybrid the following amounts:  [episode specific pay information].
    C. Payments for additional episodes (such as payments associated with the exercise of Chapman's Third Option, etc . . . [sic]) shall be negotiated by Krutonog and Hybrid in good faith.  It is understood, however, that Krutonog's increase in compensation (over the then current fee) shall be based upon the percentage increase given to Chapman for these additional episodes.
       . . .
3.   . . .
4.  Services.  Krutonog shall render such executive producer services as requested by Hybrid that are customary and usual in the industry for a similar production.  Krutonog will cooperate with Hybrid in providing such services on a timely basis provided that Krutonog's [sic] shall not be exclusive to the Series and may develop, produce and otherwise be involved with other projects during the term of this Agreement.  Notwithstanding anything in this agreement to the contrary, Hybrid shall not be required to use the services of Krutonog  in connection with the Property and/or the Series but in the event Hybrid decides not to use Krutonog's services in connection with the Property and/or the Series, Hybrid shall remain fully obligated under this Agreement for all payments, credit provisions, reimbursements and other benefits due Krutonog (collectively the "Hybrid Obligations"), including the payment of all compensation (including increases in compensation in the future), credit provisions and reimbursement of travel and expenses as described in this Agreement.  The Hybrid Obligations shall in no event require Hybrid to use Krutonog in connection with the Series.
5.  Life of the Show.  Krutonog shall be involved for the duration of the Series so long as Hybrid (or its successors-in-interest) produces the Series (i.e., for the "life of the show" as that term is understood in the industry), as well as any spin-offs originated by the Series.  During the "life of the show" Krutonog's

payment schedule shall be the same as Chapman's and he shall be entitled to increases at the same time as Chapman.
. . .

10. <u>Miscellaneous</u>.  This Agreement shall constitute the entire understanding with regard to the subject matter hereof, may not be amended or modified except in a writing signed by all of the Parties, and shall be binding upon and inure to the benefit of the Parties and their successors and assigns.  The Parties agree that the state and federal courts in New York County, New York shall have personal jurisdiction over each of them, and will be the exclusive forum for any disputes arising out of this Agreement, and that New York law as governs contracts entered into and fully performed in New York) [sic] will apply.  In the event of any action and or proceeding arising hereunder, the prevailing party shall be entitled to its attorneys' fees and costs.

11. <u>Credit</u>.  Krutonog will receive Co-Executive Producer in a shared card in first position with other Co-Executive Producers.

(Pivot Ex. 7)

Between June 2004 and December 2005, the parties made three additional amendments to the COEP:  (1) a minor amendment on June 28, 2004,[3] (the "June 2004 Amendment"), which discussed payment for additional episodes in the first production (Pivot Ex. 42); (2) a more extensive amendment on November 29, 2004, (the "November 2004 Amendment"), which discussed the terms and compensation for Season 2 of the show, (Pivot Ex. M); and (3) an extensive amendment on December 19, 2005, (Pivot Ex. 19), titled "Amendment No. 3," the effect of which is at the heart of the current action.

Before discussing the substance of these amendments, a note on terminology.  The COEP, amendments, and party submissions alternately use the terms "Season" and "Production

---

[3] Apart from the salutation, valediction, and signature blocks, the June 2004 Amendment, (Pivot Ex. 42), read, in full, as follows:

Reference is made to our Agreement dated as of December 19, 2003.  This will continue our understanding notwithstanding the provisions of that Agreement, the Production will consist of eighteen (18) half-hour episodes.  In addition to the payment provided for in the Agreement for the original six (6) hours of episodes, Hybrid will pay to Krutonog for the additional three (3) hours of episodes the sum of $8,400 per hour episode (this amount reducible by half in the event the episodes are half-hours).  Principal photography for the additional three (3) hours of episodes will take place over a period of approximately six (6) weeks commencing by the end of June 2004.

Nothing contained herein shall in any way amend or modify any other provision in the Agreement, and in all other regards the Agreement shall remain in full force and effect.

Cycle" to refer to certain sets of episodes or the period during which those episodes were, or were to be, created.[4]  The parties do not claim that there is a relevant distinction between these terms and have used them more or less interchangeably at different times.  (Pls.' SMF ¶ 12; Pivot Resp. to Pls.' SMF ¶ 12)  The Court will also use the terms interchangeably.  Additionally, the COEP and amendments refer to thirty-minute and hour-long episodes, where the pay for two thirty-minute episodes is equal to the pay for one hour-long episode.  For space and convenience, herein, the term "episode" will refer to one hour of content, regardless whether that hour was made up of two half-hour long episodes, and all references to half-hour long episodes will be omitted.

Returning to the amendments, the June 2004 Amendment added three additional episodes to the original order of six in the COEP, for a total of nine episodes in Season 1, and provided that Krutonog would be paid for those additional episodes at the rate established in Paragraph 2B of the COEP.  (Pivot Ex. 7 ¶ 2)

The November 2004 Amendment, the subject line of which is "Re:  HYBRID FILMS, INC. Agreement with Boris Krutonog as of November 19, 2003," modified Paragraph 2B of the COEP and set forth the parties' agreement with regard to Season 2.  (Pivot Ex. M)  In relevant part, it provided the following:

> This letter is to further amend the terms of the above-referenced agreement ("Agreement") between [Hybrid and Krutonog] and as amended in the letter dated June 28, 2004, in connection with the television series currently entitled "Dog the Bounty Hunter" (the "Series").
>
> The Parties acknowledge that A&E Networks has exercised its option for a Second Season of the Series and Hybrid has exercised its Second Option to require Duane "Dog" Chapman to provide continuing access to himself, his family and the business.  Paragraph 2.B of the Agreement shall be modified to

---

[4] For example, the November 2004 Amendment discusses the "Second Season of the Series," (Pivot Ex. M), while Amendment No. 3 discusses the "Third Production Cycle."  (Pivot Ex. 19)

reflect that, for his services on the Second Season, Krutonog shall be paid a co-executive producing fee of [Court's Note:  specific terms and schedule omitted.].

. . . The parties further agree that Hybrid shall have two additional options for [sic] Third and Fourth Seasons respectively.  Paragraph 2(C) of the Agreement shall be modified to reflect that, if Hybrid exercises its Third Option, which is exercisable upon airing of the final episode of the Second Season . . . Krutonog's per episode co-executive producing fees shall be increased by five percent . . . subject to increase as currently provided by Paragraph 2(C).  If  Hybrid exercises its Fourth Option, which is exercisable upon airing of the final episode of the Third Season, Krutonog's per episode co-executive producing fees shall be increased by three percent . . . subject to increase as currently provided by Paragraph 2(C).

. . .

Except as specifically set forth herein, the Agreement is not otherwise amended, and all of the remaining provisions of the Agreement shall remain in full force and effect . . . .

(Pivot Ex. M)

Finally, the parties entered Amendment No. 3, the effective date of which is listed as December 19, 2005.  (Exhibit 19)   In addition to providing compensation and other payment information, this amendment substituted Hybrid with D&D[5] and Krutonog with Pivot Point.[6] The terms of Amendment No. 3 are too numerous to be listed in full, but, in relevant part, they provide the following:[7]

WHEREAS Producer and Dog have entered into an Agreement, dated as of December 13, 2005 (the "Dog Agreement") whereby Dog has agreed to provide Dog's services on the Series for the Third Production Cycle and, at Producer's option, for three (3) additional production cycles (the "Fourth", "Fifth" and "Sixth" production cycles, respectively) of the Series (each sometimes referred to herein as an "Additional Production Cycle" and together as the "Additional Production Cycles").

. . . .

---

[5] See *supra* footnote 1.

[6] The actual terms of the substitutions are more complex than described, but any such complexity is immaterial to the disposition of the motions currently before the Court.

[7] Additional terms are included hereunder as needed.

3.  Amendment to Hybrid Agreement.[8]  The Hybrid Agreement is further amended as follows:

(a)  Third Production Cycle.  [Pivot] agrees to cause Krutonog to render all services (as described in paragraph 4 of the Hybrid Agreement) in such Episodes and Specials (as defined below) of the Series produced during the Third Production Cycle as Producer reasonably designates.

(b)  Term.  The term of the Hybrid Agreement, as amended by this Amendment No. 3, shall commence on December 19, 2003 and shall continue, subject to the terms herein, for the "life of the show" as that term is understood in the entertainment industry (the "Term").  All representations and warranties and indemnities of the parties hereto shall survive termination of the Term.

(c)  Series Compensation.  Provided that neither [Pivot] nor Krutonog is in material breach of the Hybrid Agreement, as amended by this Amendment No. 3, and subject to the rights and conditions herein, as full and complete consideration for Krutonog's services performed and rights granted, [D&D] agrees to pay [Pivot], and [Pivot] agrees to accept, the following compensation . . .

(i)  Third Production Cycle. [Court's Note:  specific terms and schedule omitted].

(ii)  Additional Production Cycles.  In the event of the production of any Episodes in any Additional Production Cycle, the Fee shall be increased as set forth in the table below.  Each such increase shall be cumulative. The payment schedule for such subsequent Production Cycles shall be on the same percentage basis on a cumulative basis as set forth in subparagraph 3(c)(i) above.

| Cycle | Percentage Increase |
| --- | --- |
| Fourth Production Cycle | 5% |
| Fifth Production Cycle | 10% |
| Sixth Production Cycle | 20% |

. . .

6. No Conflicts; Other Terms of Hybrid Agreement Unchanged.  Notwithstanding anything to the contrary contained in the Hybrid Agreement, no conflicting provision contained in the Hybrid Agreement shall be deemed in any way to supersede this Amendment No. 3 or otherwise deem this Amendment No. 3 not effective.  Except as expressly amended by the terms of this Amendment No. 3, all other terms of the Hybrid Agreement shall remain in effect unchanged, and the terms of the Hybrid Agreement, including the terms as amended by this Amendment No. 3, are hereby ratified by the parties hereto.

. . .

10.  Entire Agreement.  The Hybrid Agreement, as amended by this Amendment No. 3, shall constitute the entire agreement between the parties whether written or

---

[8] The term "Hybrid Agreement," as used in Amendment No. 3, refers to the COEP and the amendments thereto.

oral regarding the subject matter hereto and may only be amended in a writing, signed by both parties.

(Pivot Ex. 19).

The remainder of the factual history regarding the parties' dispute and the procedural history of this action, as well as the other federal, state, and administrative actions between these parties, is discussed in some length in the above-cited opinions, and the Court will not repeat it here.  However, because the dispute between Plaintiffs and Pivot Point largely relates to the Court's decisions on March 18, 2011, and May 26, 2011, some additional information about those rulings is appropriate.

In relevant part, in these rulings, the Court discussed the requirements for statutory interpleader under 28 U.S.C. § 1335 and ordered Plaintiffs to deposit into the interpleader fund certain additional funds -- over and above the amount that Plaintiffs themselves believed was in dispute -- in order to satisfy the jurisdictional requirement of statutory interpleader.  *Pivot Point Entm't, LLC.*, 771 F. Supp. 2d at 300 ("'[T]he court will not have jurisdiction in an action of interpleader unless the stakeholder has deposited the entire sum in its possession which the claimants claim.'" (quoting *Metal Transport Corp. v. Pac. Venture S.S. Corp.*, 288 F.2d 363, 365 (2d Cir. 1961))); (Dkt. No. 51).  As Magistrate Judge Cott explained, while "under rule interpleader a stakeholder may deposit the amount it believes to be in dispute, under statutory interpleader an interpleading plaintiff must deposit with the Court the highest amount claimed by defendants." [9]  *Pivot Point Entm't, LLC.*, 771 F. Supp. 2d at 300 (quoting *Nat'l Union Fire Ins. Co. v. Ambassador Grp., Inc.*, 691 F. Supp. 618, 621 (E.D.N.Y. 1988)).  Consequently, in each of these rulings, the Court ordered Plaintiffs to deposit additional funds, which Pivot Point claimed were in dispute, so that the interpleader fund would represent "the entire sum in

---

[9] Judge Cott's decision did not reach the merits of the parties' claims to the interpleaded fund.

[Plaintiffs] possession which the claimants claim."  *Id.* at 301 (quoting *Metal Transport Corp.*, 288 F.2d at 365).

As a result, then, of the jurisdictional requirement of statutory interpleader, there are essentially two interpleader funds in this case.  First, there is what the Court will term the "Base Fund," which consists of amounts that Plaintiffs recognized as being due and that they willingly deposited with the Court after filing for interpleader relief.  Second, there is what the Court will term the "Additional Fund," which Plaintiffs were ordered to deposit so as to satisfy the jurisdictional requirements of statutory interpleader.  As the parties agree, the Additional Fund consists of:  (1) Series Compensation for Production Cycles 7-8; (2) Videogram Royalties and Off Network Exploitation Fees for Production Cycles 7-8; and (3) what the parties have termed, and which term the Court adopts, "Dog's Additional Compensation."[10]  (Pls.' SMF ¶ 41; Pivot's Resp. to Pls.' SMF ¶ 41)  Together, the Base and Additional Funds represent the total amount that Plaintiffs were required to deposit in order to satisfy the jurisdictional requirement of statutory interpleader.  (Dkt. No. 53)

## II.  STANDARD OF REVIEW

### a.  Competing Summary Judgment Motions

Generally, summary judgment is proper only if there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law.  *Ramos v. Baldor Specialty Foods, Inc.,* 687 F.3d 554, 558 (2d Cir. 2012).  On a motion for summary judgment, courts are to construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor.  *Id.*  A fact is material if it might affect the outcome of the suit under the governing law and an issue is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  *Id.*

---

[10] The actual dollar amounts are not relevant for the purpose of resolving the issues herein.

If, as here, "both sides move for summary judgment, neither side is barred from asserting that there are issues of fact, sufficient to prevent the entry of judgment, as a matter of law, against it." *Heublin Inc. v. U.S.,* 996 F.2d 1455, 1461 (2d Cir. 1993) (citing *Schwabenbauer v. Bd. of Educ. of Olean,* 667 F.2d 305 (2d Cir. 1981)). "When faced with cross-motions for summary judgment, a district court is not required to grant judgment as a matter of law for one side or the other." *Id*.; *see also Morales v. Quintel Entm't Inc.* 249 F.3d 115, 121-22 (2d Cir. 2001). "Rather, the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Schwabenbauer*, 667 F.2d at 314.

b.  <u>Summary Judgment in New York Contract Interpretation Cases</u>

By the terms of the COEP and Amendment No. 3, New York law governs the contract dispute in this matter, a point neither party contests. (Pivot Ex. 7 ¶ 10; Pivot Ex. 19 ¶ 9) Under New York law, in disputes involving contract interpretation, "the standard for summary judgment is unique, because the line between fact and law is blurred." *Kobrand Corp. v. Abadia Retuerta S.A.*, No. 12 Civ. 154, 2012 WL 5851139, at *4 (S.D.N.Y. Nov 19, 2012), and "the initial interpretation of a contract is a matter of law for the court to decide." *K. Bell & Assocs., Inc. v. Lloyd's Underwriters,* 97 F.3d 632, 637 (2d Cir. 1996); *see also Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's,* 136 F.3d 82, 86 (2d Cir. 1998). This "initial interpretation" is limited to determining whether ambiguity exists as to the contract's meaning and, if there is no ambiguity, what the contract unambiguously means. *Alexander & Alexander Servs., Inc.,* 136 F.3d at 86. "Where the meaning of a contract is ambiguous, however, its interpretation is not amenable to summary judgment." *Kobrand Corp.*, 2012 WL 5851139, at *4 (citing *Alexander & Alexander Servs., Inc.,* 136 F.3d at 86 (1998)); *see also Bank*

*of N.Y. v. First Millennium, Inc.*, 607 F.3d 905, 915 (2d Cir. 2010) ("Summary judgment is generally inappropriate [if] the contested contractual language is ambiguous.").

Finally, though the determination that a contract is ambiguous will normally result in denial of a motion for summary judgment, "the court may nonetheless grant summary judgment where the extrinsic evidence illuminating the parties' intended meaning of the contract is 'so one-sided that no reasonable person could decide to the contrary.'" *N.Y. Marine & Gen. Ins. Co. v. Lafarge N. Am., Inc.*, 599 F.3d 102, 115 (2d Cir. 2010) (quoting *Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 232 F.3d 153, 158 (2d Cir. 2000)) (Sotomayor, J.). "Similarly, summary judgment may be granted despite any ambiguities in the contract 'where there is no extrinsic evidence that would support a resolution of [the] ambiguities in favor of the nonmoving party's case.'" *Id.* (quoting *Topps Co. v. Cadbury Stani S.A.I.C.,* 526 F.3d 63, 68 (2d Cir. 2008)). "These apparent exceptions merely reinforce the principle that the lynchpin of a summary judgment determination is, in most cases, the existence *vel non* of genuine issues of material facts." *Id.* (citing *AD/SAT v. AP,* 181 F.3d 216, 226 (2d Cir.1999)).

### III. PIVOT POINT AND PLAINTIFFS' CLAIMS TO THE ADDITIONAL FUND

The Court first turns to the dispute between Pivot Point and Plaintiffs as to the portion of the interpleaded fund that the Court has termed the Additional Fund, which is comprised of amounts that Pivot Point claimed were due to it under the COEP and the amendments thereto (hereinafter the "Agreement") and that Plaintiffs were thus required to deposit in order to establish jurisdiction. *See Pivot Point Entm't, LLC.*, 771 F. Supp. 2d 296.

Pivot Point and Plaintiffs both argue full entitlement to the Additional Fund: Plaintiffs claim that they are entitled to recover the full amount in the Additional Fund because these

amounts were never owed to Pivot Point (or to the Chapmans).  (Pls.' Cross-mot. 13)  Pivot

Point claims that the full sum is due to it by the terms of the Agreement.  (Pivot Mot., Dkt. No.

134, 24-25)  On a separate theory (the subject of their counterclaim and discussed below), the

Chapmans assert that they are entitled to any portion of the Interpleader Fund that the Court

determines would be due to Pivot Point under the Agreement.  (Crosscl. 10)  Because the

Chapmans' theory of recovery is premised on Pivot Point being entitled to these amounts under

the Agreement, the Court will first address what right, if any, Pivot Point has to the Additional

Fund before addressing the dispute between it and the Chapmans.

      a.  <u>Series Compensation for Seasons 7 and 8</u>

     The first portion of the Additional Fund that the Court will address is the "Series

Compensation" for Seasons 7 and 8.  This portion represents the maximum amount that Plaintiffs

could owe to Pivot Point as Series Compensation for these two seasons.  This amount, then, is

what would be due if the Court determined that Pivot Point was (1) entitled to Series

Compensation for Seasons 7 and 8 and (2) entitled to have the maximum potential yearly

increases in Series Compensation for each of those seasons.

               i.  *Pivot Point is Entitled to Series Compensation for Seasons 7 and 8*

     Plaintiffs argue that they are entitled to the entirety of this portion of the Additional Fund

because nothing in the Agreement provides for Pivot Point to receive Series Compensation for

any season after Season 6.  (Cross-mot. 13-15)  They argue that the terms of Amendment No. 3

are unambiguous and that any provision in the COEP that could be read to extend Pivot Point's

right to Series Compensation for seasons after Seasons 6 was superseded by the unambiguous

language in Amendment No. 3.  (Cross-mot. 13-18)  Specifically they argue that Paragraph 3(c)

of Amendment No. 3 conflicted with Paragraph 2C of the COEP, that the integration clause in

Amendment No. 3 provided that "no conflicting provision contained in the [COEP] shall be deemed in any way to supersede this Amendment No. 3," (Pivot Ex. 19, ¶ 6), and that, therefore, Paragraph 3(c) superseded Paragraph 2C.

Pivot Point argues that the COEP unambiguously provided for it to receive Series Compensation and annual increases commensurate to those Dog received, for "the life of the show," notwithstanding any of the season-specific terms in the COEP or in any of the amendments.  (Pivot Mot., Dkt. No. 134, 11-22)  Pivot argues that, as a policy matter, interpreting Amendment No. 3 to eliminate post-Season 6 payments would amount to an absurdity and a forfeiture, in violation of the New York rules of statutory interpretation.  (Pivot Mot., Dkt. No. 134,18-19)  Although it claims that the terms of the Agreement unambiguously provided for Series Compensation for Seasons 7 and 8, Pivot argues that the extrinsic evidence in this case provides further proof that the intent of the parties was for it to receive Series Compensation for any Season that Plaintiffs produced, for the life of the show.  (Pivot Mot., Dkt. No. 134,19-24)

For Pivot Point to be entitled to Series Compensation for Seasons 7 and 8, as a matter of law, the Court would first have to conclude that the Agreement is unambiguous on this point.  If it is unambiguous, the Court must apply the plain meaning of the Agreement.  If, and only if, the Court concludes that the contract is ambiguous will it consider extrinsic evidence, and summary judgment will only be appropriate if the extrinsic evidence is so one sided as to allow the Court to enter judgment as a matter of law notwithstanding the ambiguity.  *See Palmieri v. Allstate Ins. C*o., 445 F.3d 179, 187 (2d Cir. 2006) (quoting *Thompson v. Gjivoje,* 896 F.2d 716, 721 (2d Cir. 1990)).  As explained below, the Agreement here is unambiguous with regard to Series Compensation.  By its unambiguous terms, the plain meaning of the Agreement without

reference to extrinsic evidence provides for Pivot Point to receive Series Compensation for

Seasons 7 and 8.  Accordingly, Plaintiffs are not entitled to recover this portion of the Additional

Fund.

Under New York law, "[a] contract is ambiguous when it could suggest multiple

meanings to a reasonable, objective reader familiar with the context of the contract."  *Kobrand*

*Corp.*, 2012 WL 5851139, at *4 (citing *Alexander & Alexander Servs. Inc.*, 136 F.3d at 86); *see*

*also Rogath v. Siebenmann*, 129 F.3d 261, 267 (2d Cir. 1997) ("A contractual term is ambiguous

where it may be ascribed conflicting reasonable interpretations.").  "Contract language is not

ambiguous if it has 'a definite and precise meaning, unattended by danger of misconception in

the purport of the [contract] itself, and concerning which there is no reasonable basis for a

difference of opinion.'"  *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 396 (2d Cir. 2009) (quoting

*Breed v. Ins. Co. of N. Am.,* 385 N.E.2d 1280 (1978)).  "Thus, if the agreement on its face is

reasonably susceptible of only one meaning, a court is not free to alter the contract to reflect its

personal notions of fairness and equity."  *Greenfield v. Philles Records, Inc.*, 780 N.E.2d 166,

170-71 (N.Y. 2002).  While "[a]mbiguity is determined by looking within the four corners of the

document, not to outside sources," *Kass v. Kass,* 696 N.E.2d 174, 180 (N.Y.1998), "the Court

should take into account both the language of the contract and the inferences that can be drawn

from that language."  *Kobrand Corp.*, 2012 WL 5851139, at *4.

The COEP unambiguously provided that Krutonog would receive Series Compensation

for as long as Hybrid or its successors produced the show,[11] regardless of whether Hybrid in fact

---

[11]  Paragraph 5 provides, in part:  "Krutonog shall be involved for the duration of the Series so long as Hybrid (or its successors-in-interest) produces the Series (i.e., for the 'life of the show' as that term is understood in the industry)." (Pivot Ex. 7 ¶ 5)

utilized Krutonog's services.[12]  While the COEP only provided specific compensation details for the first six -- and subsequent 13 to 24 -- episodes, it anticipated the possibility of future episodes and seasons and, in Paragraph 2C, created a general method for determining the compensation for those future episodes or seasons.[13]  The unambiguous meaning of these terms is that Krutonog had a right to receive Series Compensation for any episode or season that Hybrid produced regardless of when this production occurred or for what Season.  *C.f. Readco, Inc. v. Marine Midland Bank,* 81 F.3d 295, 299 (2d Cir. 1996) ("A contract is ambiguous where reasonable minds could differ on what a term means, but no ambiguity exists where the alternative construction would be unreasonable." (internal citations omitted)).

Because the COEP was unambiguous as to Series Compensation extending without a temporal cut-off, the remaining question is whether anything in the amendments changed or superseded the relevant provisions of the COEP such that Series Compensation was to terminate at the end of Season 6.  Plaintiffs claim that Paragraph 3(c) of Amendment No. 3 did just that. (Cross-mot. 8)  As noted above, that paragraph says:

> (3)(c):  Provided that neither [Pivot] nor Krutonog is in material breach of the Hybrid Agreement, as amended by this Amendment No. 3, and subject to the terms and conditions herein, as full and complete consideration for Krutonog's services performed and rights granted, [D&D] agrees to pay [Pivot], and [Pivot] agrees to accept, the following compensation . . . .

(Pivot Ex. 19 ¶ 3(c))  Following this introductory language are four subsections:  (i) lays out, in detail, "[t]he payment schedule for the Fee for the Third Production Cycle;" (ii) discusses

---

[12] Paragraph 4 provides, in part:  "Hybrid shall not be required to use the services of Krutonog . . . but in the event Hybrid decides not to use Krutonog's services . . . Hybrid shall remain fully obligated under this Agreement for all payments, credit provisions, reimbursements and other benefits due to Krutonog . . . including the payment of all compensation (including increases in compensation in the future) . . . ."  (Pivot Ex. 7 ¶ 4)

[13] Paragraph 2C provides, in part:  "Payments for additional episodes . . . shall be negotiated by Krutonog and Hybrid in good faith.  It is understood, however, that Krutonog's increase in compensation (over the then current fee) shall be based upon the percentage increase given to Chapman for these additional episodes."  (Pivot Ex. 7 ¶ 2)

compensation for "Additional Production Cycles;" (iii) discusses "Extra Episodes;" and (iv) discusses "Specials." (Pivot Ex. 19 ¶ 3(c)) Plaintiffs argue that because Paragraph 3(c) describes the compensation as "full and complete consideration for Krutonog's services performed and rights granted," and because the underlying discussion of Series Compensation only provides for Season 3 through 6, Pivot Point was not entitled to any further Series Compensation after Season 6. In Plaintiffs' view, by the plain terms of Paragraph 6 of Amendment 3 (the integration clause), Paragraph 3(c) of that amendment supersedes Paragraph 2C of the COEP with regard to Series Compensation for any future episodes.

"Generally, under New York law, 'a subsequent contract regarding the same subject matter supersedes the prior contract.'" *CreditSights, Inc. v. Ciasullo*, No. 05 Civ. 9345, 2007 WL 943352, at *6 (S.D.N.Y. Mar. 29, 2007) (quoting *Indep. Energy Corp. v. Trigen Energy Corp.,* 944 F. Supp. 1184, 1195-96 (S.D.N.Y.1996)). "However, a subsequent contract not pertaining to 'precisely the same subject matter' will not supersede an earlier contract unless the subsequent contract has definitive language indicating it revokes, cancels or supersedes that specific prior contract." *Id.* (quoting *Globe Food Servs. Corp. v. Consolidated Edison Co. of N.Y., Inc.,* 184 A.D. 2d 278, 279-80, 584 N.Y.S.2d 820, 821 (1st Dep't. 1992)). To determine if a particular provision is superseded by a provision in a subsequent contract, the Court considers: (1) "whether there is an integration and merger clause that explicitly indicates that the prior provision is superseded;" (2) "whether the two provisions have the same general purpose or address the same general rights;" and (3) "whether the two provisions can coexist or work in tandem." *Medtech Products Inc. v. Ranir, LLC*, 596 F. Supp. 2d 778, 809 (S.D.N.Y. 2008) (citing *CreditSights,* 2007 WL 943352, at *7-9; *Indep. Energy Corp.,* 944 F. Supp. at 1196-97).

17

Plaintiffs argue that each of these considerations demonstrate that Paragraph 3(c) superseded Paragraph 2C.  They are wrong.

First, Plaintiffs argue that the Court should find that the earlier clause was superseded because Amendment No. 3 has an integration clause that "expressly provides that any inconsistent provision of the [COEP] is superseded by its terms in Amendment No. 3."  (Pls.' Cross-mot. 17)  However, although Amendment No. 3 has both an integration clause and a merger clause (Pivot Ex. 19 at ¶¶ 6, 10), neither clause "explicitly indicates that the prior provision is superseded."  *Medtech Products Inc.,* 596 F. Supp. 2d at 809.  Rather, the integration clause broadly provides that "no conflicting provision in the [COEP] shall be deemed in any way to supersede this Amendment No. 3," (Pivot Ex. 19 ¶ 6), and the equally general merger clause provides that "The Hybrid Agreement, as amended by this Amendment No. 3, shall constitute the entire agreement between the parties . . . ."  (Pivot Ex. 19 ¶ 10)  Nothing in these clauses can be read as "explicitly indicat[ing]" that Paragraph 3(c) in Amendment No. 3 superseded Paragraph 2C.  *Consolidated Edison Co. of N.Y., Inc.,* 184 A.D. 2d at 279-80, 584 N.Y.S.2d at 821 (holding that a later contract containing the phrase "this contract shall replace all prior agreements" was not sufficiently definitive to supersede a particular earlier contract).  This consideration, therefore, fails to demonstrate that the latter paragraph superseded the former. *Medtech Products Inc.,* 596 F. Supp. 2d at 809.

Second, Plaintiffs argue that the latter clause superseded the former because the two paragraphs have the same general purpose, address the same general rights, and -- by their terms -- cover the same subject matter.  This again, is wrong.  Comparing the two paragraphs, it is unreasonable to suggest that they cover "precisely the same subject matter," as required under New York law. *See CreditSights*, 2007 WL 943352, at *9.  Paragraph 2C is a forward-looking

clause that describes the process and manner by which the parties will decide specific compensation amounts -- for instance the amounts in Paragraph 2A and 2B of the COEP, those in the June 2004 Amendment, and those in the November 2004 Amendment.  Paragraph 3(c) of Amendment No. 3, on the other hand, is a recitation of the specific amounts to be paid for Season 3 through 6, and serves the same basic purpose as Paragraphs 2A and 2B of the COEP and as both of the 2004 Amendments.  Indeed, if Paragraph 3(c) superseded any portion of the COEP, it would supersede Paragraph 2A and 2B, which, like the Paragraph 3(c), cover season-specific, per-episode-payments.

Finally, contrary to Plaintiffs' contention, these two paragraphs can coexist and work in tandem.  In fact, Paragraph 2C creates an ongoing obligation for the parties to engage in good faith negotiation to come to the exact type of agreement memorialized in Paragraph 3(c): Paragraph 2C is the command, Paragraph 3(c), the output.  Accordingly, these paragraphs not only can coexist and work in tandem, Paragraph 2C actually anticipates and requires the parties to create Paragraph 3(c).[14]  In the COEP, the term of the contract was defined as extending for "the life of the show," but compensation was only accounted for as to the first six episodes.  Thus, any time additional episodes were added that were not contemplated in the COEP (or in a subsequent amendment), Paragraph 2C created an obligation for the parties to negotiate future compensation and a method for doing so.  Moreover, the 2004 Amendments and Amendment No. 3 did just this:  each time Plaintiffs exercised their option to create new episodes or a new

---

[14]In their opposition to Pivot's Motion for Summary Judgment, Plaintiffs recognize this conclusion.  They state: "[T]he parties complied with the 'understanding' set forth in Paragraph 2C of the 2003 COEP Agreement:  they negotiated in good faith an increase in compensation for additional episodes for Pivot Point based upon the increase in such compensation granted to Dog Chapman."  (Pls.' Opp'n 10)  To conclude from this (as Plaintiffs do) that Paragraph 3(c) superseded Paragraph 2C, however, would require ignoring the numerous other times that the parties had engaged in similar good-faith negotiations in compliance with Paragraph 2C.

season of the show, they would negotiate with Pivot to determine Series Compensation and other payment terms for these additional episodes.[15]

Even drawing all reasonable inferences in Plaintiffs' favor, the Agreement as a whole -- the COEP and all of the amendments -- is unambiguous and no reasonable jury could conclude other than that Paragraph 3(c) did not supersede Paragraph 2C.  The fact that Amendment No. 3 only discussed payment terms for Seasons 3 through 6 is consistent with the ongoing obligation under Paragraph 2C to negotiate future agreements and with the terms included in each of the previous amendments.  Read in conjunction with the entire Agreement, the "full and complete consideration" clause of Paragraph 3(c) is limited to Seasons 3 through 6, to wit, the Series Compensation described in Paragraph 3(c) is the full and complete consideration for the co-executive producer services Pivot Point was to provide *during those same Seasons*.

Accordingly, the Agreement is facially unambiguous as to payment of Series Compensation, and no reasonably jury could conclude other than that Pivot Point was entitled to receive Series Compensation for so long as Plaintiffs produced the show.  *See Medtech Products Inc.*, 586 F. Supp. 2d at 808 ("Contractual language is not ambiguous simply because the parties 'urge different interpretations in the litigation,' *Metro. Life,* 906 F.2d at 889, rather, contractual language is ambiguous only if it is subject to more than one reasonable interpretation.") (citing *Consarc Corp. v. Marine Midland Bank, N.A.,* 996 F.2d 568, 573 (2d Cir.1993)).  Consequently, the Agreement provides for Pivot Point to receive Series Compensation for Seasons 7 and 8.  This conclusion does not, however, determine the exact amount of Series Compensation that Plaintiffs owe for those seasons.  The Court now turns to that question.

---

[15] When Plaintiffs ordered three additional Episodes in Season 1, the parties signed the June 2004 Agreement. When Plaintiffs signed Dog to Season 2, the parties negotiated the November 2004 Amendment.  When Plaintiffs again signed Dog for Season 3 through Season 6, the parties negotiated Amendment No. 3.

> ii.  *Pivot Point is Entitled to Commensurate Increases in Series*
>
> *Compensation for Seasons 7 and 8*

As noted above, Paragraph 2C provides a general method by which to determine compensation for additional seasons or episodes.  Accordingly, the question as to the amount due for Series Compensation for Seasons 7 and 8 requires the Court to determine whether the Agreement unambiguously defines the percentage increase, if any, that Pivot Point should have received for Series Compensation for Seasons 7 and 8.  Plaintiffs primarily rely on an argument that Pivot Point was not entitled to *any* Series Compensation for Seasons 7 and 8, but argue, generally, that nothing in Paragraph 2C can be read as entitling Pivot Point to increases commensurate with the increases granted to Dog.  (Pls.' Opp'n 10)  Pivot Point disagrees and argues that both the plain terms of the Agreement and the relevant extrinsic evidence demonstrate that it is entitled to increases in compensation commensurate with those given to Dog.  (Pivot Mot., Dkt. No 134, 11; Pivot Opp'n to Pls.' Cross-mot. 2)  The Court concludes that the Agreement is ambiguous as to increases in Series Compensation, but that no reasonable person analyzing the extrinsic evidence in this case could conclude other than Pivot was entitled to increases in Series Compensation for Seasons 7 and 8 commensurate with those given to Dog.  *See Lafarge N. Am., Inc.*, 599 F.3d at 115 ("[T]he court may nonetheless grant summary judgment where the extrinsic evidence illuminating the parties' intended meaning of the contract is 'so one-sided that no reasonable person could decide to the contrary.'").

The relevant provisions in the COEP are Paragraphs 2C and 5.  Paragraph 2C provides that "Krutonog's increases in compensation (over the then current fee) shall be *based upon* the percentage increase given to [Dog] for these additional episodes;" Paragraph 5 provides that "Krutonog's payment *schedule* will be the same as [Dog's] and he shall be entitled to increases

21

*at the same time* as [Dog]."  (Pivot Ex. 7 (emphasis added))  Neither singularly nor in conjunction do these phrases unambiguously require Plaintiffs to provide Krutonog with percentage increases equal to or commensurate with those they provided to Dog.  Rather, these terms entitle Krutonog to be *paid* at the same time as Dog, to *receive increases* at the same time as Dog, and to have these increases be *based upon* those provided to Dog.  This ambiguity is not resolved in any of the amendments.

Although the terms of the Agreement are ambiguous as to the percentage increase in Series Compensation, if any, that Pivot Point is entitled to for Seasons 7 and 8, the Court may nonetheless grant summary judgment if the extrinsic evidence is "so one-sided that no reasonable person could decide to the contrary," *Compagnie Financiere,* 232 F.3d at 158, or if "there is no extrinsic evidence that would support a resolution of [the] ambiguities in favor of the nonmoving party's case." *Lafarge*, 599 F.3d at 115.  Here, the extrinsic evidence demonstrates that Pivot Point's percentage increases in Series Compensation were to be commensurate with those Dog received, and Plaintiffs have not provided extrinsic evidence or argument to refute this calculation.

The evidence here shows that while the COEP provided that Krutonog's increases were to be "based upon" Dog's increases, the parties' practice was to provide Krutonog with increases that were commensurate with Dog's.  In this Circuit, evidence that demonstrates the parties' course of conduct is relevant in determining the parties intent.  *Lafarge N. Am., Inc.*, 499 F.3d at 119 ("Conduct of the parties provides another important source for deriving their intent as to the meaning of the [contracts] at issue.  There is no surer way to find out the intent of the parties to a contract than to see what they have done." (internal marks and omissions omitted)); *see also City of N.Y. v. N.Y. City Ry. Co.,* 193 N.Y. 543, 548, 86 N.E. 565 (1908) ("When the parties to a

contract of doubtful meaning . . . enforce it for a long time by a consistent and uniform course of conduct, so as to give it a practical meaning, the courts will treat it as having that meaning . . . .").  Here, the parties course of conduct shows that each increase (either actual, or forward-looking), allotted Pivot an identical percentage increase as the one Dog received. *Compare* (Pivot Ex. 7), *with* (Pivot Ex. 89); (Pivot Ex. 19 ¶ 3) *with* (Pivot Ex. 20 ¶ 7). Additionally, there is no evidence on the record that the parties negotiated this term separately with Krutonog prior to entering into the amendments.  Rather, the evidence presented shows that each time Dog received a percentage increase in Series Compensation, Krutonog, without discussion, received an equal percentage increase.

Under these facts, the Court concludes that no reasonable jury could find other than that the practical meaning of the term "based upon" in Paragraph 2C was understood as meaning "equal to," and that Pivot Point was entitled to the same percentage increase as Dog for Series Compensation for Seasons 7 and 8.

### iii.   *Plaintiffs are not Entitled to Recover the Portion of the Additional Fund Deposited as Series Compensation for Seasons 7 and 8*

Based on the above discussion, the Court concludes that, under the terms of the Agreement, Pivot Point was entitled to receive Series Compensation for Seasons 7 and 8 in a per-episode amount equal to the fee it received in Season 6, increased cumulatively by the percentage increase Dog received in those same Seasons (Seasons 7 and 8).  This amount should be equal to the "Series Compensation" portion of the Additional Fund that Plaintiffs were required to deposit in order to establish the jurisdictional requirement for statutory interpleader. Consequently, the Court denies the portion of Plaintiffs' Cross-Motion for Summary Judgment seeking a declaration that Plaintiffs are entitled to recover the portion of the Additional Fund

deposited as "Series Compensation."  However, because of the posture of this case, the Court's

determination that Pivot Point was entitled to Series Compensation for Seasons 7 and 8, as a

matter of law, does not mean that Pivot Point is entitled to *recover* those amounts.  Rather, the

effect of denying this part of Plaintiffs' motion is to "transfer" that portion of the Additional

Fund into the Base Fund, the recovery of which will depend on the resolution of the dispute

between Pivot Point and the Chapmans.  Before addressing that dispute, however, the Court must

first resolve the outstanding elements of the dispute between Plaintiffs and Pivot Point, first as to

the remaining portions of the Additional Fund, and then as to Pivot Point's counterclaims against

Plaintiffs.

        b.  <u>The Remainder of the Interpleaded Fund</u>

Both Pivot Point and Plaintiffs also seek summary judgment in their favor as to the

remainder of the Additional Fund, which consists of (1) "Off Network Exploitation Fees for

Production Cycles 7 and 8;" (2) "Dog's Additional Compensation;" and (3) Videogram

Royalties.  (Pls.' SMF ¶ 46)  For the reasons discussed below, the Court determines that Pivot

Point is entitled to summary judgment as to Off Network Exploitation Fees for Production

Cycles 7 and 8, but that there are disputed issues of material fact that preclude granting either

party's motion for summary judgment as to the other amounts.

        i.  *Off Network Exploitation Fees for Seasons 7 and 8*

The terms of Amendment No. 3 unambiguously entitle Pivot Point to Off-Network

Exploitation Fees for the "Series."  While the relevant provision in Amendment No. 3 inarguably

superseded the provision in the COEP,[16] the remainder of Paragraph 3(e)(ii) is equally

unambiguous in providing that Pivot Point would receive Off Network Exploitation Fees for the

---

[16] To this point, Paragraph 3(e)(ii)(A) says:  "For avoidance of doubt, the foregoing amounts are in lieu of any amounts Lender and/or Krutonog may previously have been entitled to in the [COEP] Agreement."

"Series."  Earlier in Amendment No. 3, the capitalized word "Series," as used in Paragraph

3(e)(ii), is defined as "the television program entitled *'Dog the Bounty Hunter.'*"  Even absent

this definition, the plain meaning of the word "Series" implies inclusion of all episodes of the

program, not season-specific sets of episodes.  Nor does the fact that, pursuant to Paragraph

3(e)(ii)(B), Pivot is to receive certain higher percentages for Seasons 5 and 6 make this term

ambiguous given the earlier use of the term Series in this subparagraph.

 Accordingly, because the term Series is unambiguous, the Court applies the plain

meaning of that term to the contract provision in question.  That provision provides that

"[Plaintiffs] shall pay [Pivot Point] [X] percent of "Gross Receipts" (as defined below) derived

from its distribution and exploitation of the Series."  (Pivot Ex. 19 ¶ 3(e)(ii))  This phrase can

only reasonably be read as providing that Pivot Point was entitled to receive these amounts for

the Off Network Exploitation of the show as a whole, not for particular seasons.  Moreover, this

reading comports with the earlier provision in Amendment No. 3 (and in the COEP), whereby

the parties agreed that the term of the Agreement was for "the life of the show."  (Pivot Ex. 19 ¶

2)

 Accordingly, the Court denies the portion of Plaintiffs' motion for summary judgment

seeking a declaration that Plaintiffs are entitled to recover this portion of the Additional Fund.

As with the Series Compensation, the effect of denying Plaintiffs' motion as to these amounts is

to "transfer" them into the Base Fund, the eventual recovery of which will depend on the

resolution of the dispute between Pivot Point and the Chapmans.

  ii.  *Dog's Additional Compensation*

 Pivot argues that it is entitled to a proportionate amount of a number of "disguised"

payments that Plaintiffs made to the Chapmans and that Pivot claims should have been included

in Series Compensation.  (Pivot Mot., Dkt. No. 133, 8-10)  Plaintiffs argue that these were

legitimate disbursements, and that, regardless, Pivot has no claim to these amounts under the

Agreement.  The Court finds that summary judgment is inappropriate as to these amounts.  *See*

*Ramos*, 687 F.3d at 558.

The Court has already determined that the Agreement is ambiguous as to Pivot Point's

right to receive percentage increases in Series Compensation equal to those Dog received.  While

the Court was able to determine that, pursuant to Paragraph 2C, Pivot Point was owed a

percentage increase commensurate with the one given to Dog for episodes produced during

Seasons 7 and 8, neither Paragraph 2C, nor any term in the Agreement, provides that Pivot Point

was entitled to a proportionate payment for all additional compensation that Dog received.

Pivot Point argues that Plaintiffs should have provided these amounts to Dog in the form

of a larger percentage increase in Series Compensation, rather than in the forms they were in fact

paid.  As Pivot sees it, if these amounts had been properly paid as a percentage, Pivot, too, would

have been entitled to a larger percentage increase in Series Compensation (a conclusion that

comports with the Court's earlier finding as to the parties' understanding on this point).  This

argument is not pure conjecture, given that Pivot is able to point to an internal Plaintiffs' email

discussing Dog's 2005 contract, which notes that a certain payment to the Chapmans was "to be

termed 'expenses,'" and says that "it is not AETN's intention that [Krutonog] receive any

increase in EP fees, which is part of the rationale for the way we're proposing the restructuring."

(Pivot Ex. 13 (emphasis added))

The Court finds that there is a genuine, material dispute of fact as to whether these

amounts paid to Dog as additional compensation should have been included as a percentage

increase in Series Compensation instead, and, if so, what amount (if any) Pivot would be entitled

to as a result.  Accordingly, the Court denies both Pivot Point's and Plaintiffs' motions for summary judgment in so far as they request a determination of entitlement to this portion of the Additional Fund.

> iii.  *Videogram Royalties*

The next category of funds in the Additional Fund are amounts that Pivot Point argues it is owed for Videogram Royalties[17] under Paragraph 3(e)(i) of Amendment No. 3.  The relevant provision of this paragraph says:

> In respect of Network's exclusive distribution of Videograms (as defined below) of the Series, Network shall pay Lender a royalty equal to [X%] of the Videogram Gross Receipts (increasing to [X%] of any Videogram Gross Receipts solely in connection with Videograms consisting solely of Episodes from the Fifth and/or Sixth Production Cycles, if any, or commencing with the 100th Episode (including all Episodes and one-hour Specials- which will count as two Episodes). [sic]

(Pivot Ex. 19 ¶ 3(e)(i))

This provision falls somewhere between ambiguous and unintelligible, depending on where the missing close-parenthesis was supposed to be placed, and it can be read to support either party's position.  For instance, if the missing close-parenthesis is placed after "Videogram Gross Receipts," the provision would support Plaintiffs' argument that these amounts were not to continue after Season 6.  If, however, the close-parenthesis is placed at the end of the provision -- so it would read " . . . as two Episodes))" -- the provision would support Pivot's argument that these amounts were to be paid for the Series as a whole, with an increase for Seasons 5 and 6. As either of these readings are equally reasonable, and given that neither party's arguments

---

[17] A Videogram is defined in Paragraph 3(e)(i), as including "video cassette, video disc, and all other video device forms and configurations, including 'Linear  Interactive Device(s)' and 'Non-Linear Interactive Device(s)' (both as defined hereafter), and any and all interactive devices or technologies now or hereafter developed."  Videogram Royalties, or Videogram Gross Receipts, are defined in that Paragraph as "all monies actually received by Network from Videogram distribution worldwide for the Third Production Cycle onwards, excluding amounts collected or deducted for taxes and for shipping and handling, less deductions for all actual, verifiable costs and expenses  [etc]." (Pivot Ex. 19 at ¶ 3(e))

provides insight into or extrinsic evidence to resolve this quandary, summary judgment as to these amounts is inappropriate, and the Court denies both parties' motions insofar as they request a determination of entitlement to this portion of the Additional Fund.

      c.  <u>Summary</u>

For the reasons listed above, the Court denies the portion of both Plaintiffs' and Pivot Point's motions for summary judgment with regard to Dog's Additional Compensation and Videogram Royalties and it denies the portion of Plaintiffs' motion for summary judgment as to Series Compensation and Off-Network Exploitation. Accordingly, there remains a dispute between Plaintiffs and Pivot as to Dog's Additional Compensation and Videogram Royalties, but the Court determines that the remainder of the funds that Plaintiffs were required to deposit were due under the Agreement between Plaintiffs and Pivot Point.

## IV. THE REMAINDER OF PLAINTIFFS' SUMMARY JUDGMENT MOTION

Before turning to Pivot Point's motion for summary judgment against the Chapmans, the Court will first address the remainder of Plaintiffs' Motion for Summary Judgment against Pivot Point. In addition to seeking summary judgment as to the Additional Fund, Plaintiffs also seek summary judgment on Pivot Point's 2nd, 3rd, and 4th counterclaims. These counterclaims request, respectively, damages, an accounting, and declaratory relief regarding co-executive producer credit. (Countercl. ¶¶ 35-47) For the reasons discussed below, the Court grants Plaintiffs' motion as to each of these counterclaims.

      a.  <u>Pivot is Not Entitled to Damages</u>

Plaintiffs seek summary judgment on Pivot Point's second counterclaim, in which Pivot asserts that it is entitled to damages arising from Plaintiffs' breach of contract[18] -- save for those that were discharged by the Court's Order on July 15, 2011.  (Countercl. ¶ 37)

Plaintiffs argue that there can be no breach, as a matter of law, if, as here, the alleged breach is premised on a stakeholder's election not to comply with the terms of a contract and instead commence an interpleader action, in light of conflicting claims to the benefit of the contract.  (Pls.' Cross-mot. 23-24)  Pivot argues that, prior to filing the interpleader action, Plaintiffs had recognized that certain amounts were due to Pivot under the terms of the Agreement, that they retreated from these admissions when the amounts due increased (upon the exercise of the option to produce Season 8), and that Plaintiffs actions thus amount to a breach. (Pivot Opp'n to Pls.' Cross-mot. 11)  Even assuming breach, Pivot's claim lacks merit because, as to the damages it asserts, Pivot is either barred from making such an assertion or Plaintiffs have been discharged of liability from such damages.[19]

On July 15, 2011, this Court ordered, *inter alia*, that:  (1) Plaintiffs' motion for interpleader and other relief was granted; (2) "Plaintiffs [we]re discharged from all liabilities to Defendants with respect to the property thus deposited;" and (3) "Defendants and all other persons or entities that may assert claims against Plaintiffs are enjoined and restrained from commencing or prosecuting any action or proceeding against Plaintiffs to recover all or any portion of the property deposited and to be deposited."  (Dkt. No. 53, ¶¶ 1, 2, 5)

---

[18] Pivot Point's counterclaim alleges that it performed, or Plaintiffs waived performance of, all of Pivot Point's duties under the Agreement, but that Plaintiffs breached the Agreement by:  (a) refusing to pay Pivot Point the amounts it is due; (b) repudiating the obligation to make payment for post-Season 6 production and exploitation, to include the requisite compensation increases; (c) failing to acknowledge in the New York state action that certain amounts were due to Pivot Point; and (d) failing to provide the required quarterly accountings.  (Countercl. ¶ 37)

[19] Under New York law: "[T]he complaint in an action to recover damages for breach of contract must show: (1) the terms of an existing contract, including good consideration; (2) performance upon the part of the plaintiff; (3) breach by the defendant; and (4) the damages sustained thereby; boiler-plate allegations of damage may not be sufficient." N.Y. Contract Law § 442 (Dietz, et. al. 2013).

To the extent that this claim alleges *any* damages, by the terms of the Court's Order on July 15, 2011, (Dkt. No. ¶ 53), Plaintiffs are either discharged from liability for those damages or Pivot is enjoined and restrained from commencing an action to recover them.  A prerequisite for granting interpleader relief in this action was the determination that the entire amount Plaintiffs could owe to Pivot be deposited with the Court.  *Pivot Point Entm't, LLC*, 771 F. Supp. 2d at 301-02.  Because the interpleader fund represents the entire amount in dispute between these parties with regard to the Agreement,[20] there are no damages asserted in Pivot's Counterclaim that are not discharged and barred as a matter of law under this Court's Order on July 18, 2011. Accordingly, Plaintiffs are entitled to summary judgment on this counterclaim.

      b.   Pivot is Not Entitled to an Accounting

Plaintiffs also seek summary judgment on Pivot's third counterclaim, in which Pivot asserts that it is entitled to an accounting in order to determine the exact amount of money it is due from Plaintiffs.  (Counterclaim at ¶¶ 39-42)  Plaintiffs argue that they are entitled to summary judgment on this counterclaim because they have already produced any documents necessary to calculate and verify amounts that could be due to Pivot under the Agreement and that by this Court's Order, the interpleaded fund (to include future royalties that become due) is itself an accounting of the possible amounts due.  (Pls.' Cross-mot. 24-25)  In opposition, Pivot Point states:  "The Third Claim, for Accounting is appropriate.  Admittedly, though, it is dispensable in that it really is only a remedy, which can be fashioned under the rubric of the other causes of action in this interpleaded action."  (Pivot Opp'n to Pls.' Cross-mot. 12)

---

[20] *See Pivot Point Entm't, LLC*, 771 F. Supp. 2d at 301 ("I need not interpret the Hybrid and Pivot Point Agreements here. Instead, I need only assess whether Plaintiffs have deposited in the Court's Registry "the entire sum in its possession which the claimants claim.  This Plaintiffs have not done. Consequently, Plaintiffs shall deposit in the Court's Registry an amount commensurate to all compensation increases that have been granted to Mr. Chapman since the signing of the Pivot Point Agreement.") (internal citation omitted).

The Court finds that the requested relief has already been granted as a matter of law by virtue of Magistrate Judge Cott's Memorandum and Order on March 18, 2011, *Pivot Point Entm't, LLC*, 771 F. Supp. 2d 296, and this Court's Order on May 26, 2011, (Dkt. No. 51 (Gardephe, J.)).  Under New York law, "[w]here a party seeks an accounting, but the primary demand is for monetary damages, the accounting is merely a method to determine the monetary damages.  The action therefore sounds in law and not in equity."  *Arrow Commc'ns Lab. v. Pico Prods.,* 632 N.Y.S.2d 903, 905 (4th Dep't. 1995) (internal quotations and citations omitted); *see also Leveraged Leasing Admin. Corp. v. PacifiCorp Capital*, 87 F.3d 44, 49 (2d Cir. 1996) (quoting *Pico Prods.*, 632 N.Y.S.2d at 905).  Here, prior to granting interpleader relief to Plaintiffs, the Court was required to and did determine that Plaintiffs had deposited the maximum amount that Pivot Point claimed to be due under the agreement (to include what Pivot Point describes as "disguise[d] additional compensation to Dog."  (Pivot's Resp. to Pls.' SMF ¶ 50)).[21]  The claim for an accounting, then, is "duplicative and unnecessary, since [Pivot] could recover money damages for the claims pled," even absent the accounting.  *Matsumra v. Benihana Nat. Corp*, No. 06 Civ. 7609, 2007 WL 1489758, at *4 (S.D.N.Y. May 21, 2007); *see also Hettinger v. Kleinman*, 733 F. Supp. 2d 421, 447 (S.D.N.Y. 2010) ("Because [plaintiff] has an adequate remedy at law through his claims for fraud and his claims for breach of [contract], he is not entitled to an accounting.").  Because this claim has already been resolved as a matter of law, Plaintiffs are entitled to summary judgment.

### c.  Pivot Point is Not Entitled to Declaratory Relief

---

[21] To establish the jurisdictional requirement of statutory interpleader, Plaintiffs were required to deposit the maximum amount claimed by any interpleaded party.  *Pivot Point Entm't, LLC.*, 771 F. Supp. 2d at 301. Because Pivot Point claimed that this amount included any compensation increases to Chapman, Magistrate Judge Cott ordered that "Plaintiffs shall deposit into this Court's Registry an amount commensurate to all compensation increases granted to Mr. Chapman since the signing of the Pivot Point Agreement," and that Plaintiffs were to provide "all documents that will allow Pivot Point to substantiate the compensation increases and thus verify the accuracy of the amount of the deposit."  *Id.* at 302-03.

Finally, Plaintiffs seek summary judgment on Pivot's fourth counterclaim, which seeks a declaration that Plaintiffs will "continue to honor the contractual obligation to give Co-Executive Producer credit to Krutonog under the contract." (Countercl. ¶ 45)  Plaintiffs argue that summary judgment is appropriate on this crossclaim because "Krutonog has received and continues to receive, co-executive producer credit." (Cross-mot. 24)  Because Pivot Point does not dispute that it received co-executive producer credit through Season 8, (Pivot's Resp. to Pls.' SMF ¶ 56), and in light of the fact that Plaintiffs have not exercised their option to renew the series, Pivot's fourth claim is dismissed as moot.

## V.  PIVOT POINT IS NOT ENTITLED TO SUMMARY JUDGMENT AGAINST THE CHAPMANS

The Chapmans assert three claims, which, together or in the alternative, could entitle them to recover from the interpleader fund any amounts that would be owed to Pivot Point under the Agreement between Pivot Point and Plaintiffs.  (Crosscl. ¶ 17)  Pivot argues that summary judgment is appropriate on each claim, while the Chapmans assert that there are genuine issues of material fact that preclude summary judgment on any of their claims.  The Court agrees with the Chapmans that summary judgment is inappropriate at this time.

Because only Pivot Point has moved for summary judgment, the Court must construe the evidence in the light most favorable to the Chapmans and draw all reasonable inferences in their favor.  *See Ramos,* 687 F.3d at 558.  A fact is material if it might affect the outcome of the suit under the governing law and an issue is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  *Id.*  Summary judgment is only proper if there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law.  *Id.*

a.  Breach of Fiduciary Duty

The Chapmans assert two claims -- breach of fiduciary duty and contract illegality -- both of which relate to the existence and type of fiduciary/agency relationship, if any, between themselves and Krutonog/Pivot Point.  Looking first to the breach of fiduciary duty claim, the Chapmans argue that as their personal manager and as their *de facto* talent agent, Krutonog/Pivot Point owed them a fiduciary duty, which included putting their financial interests first.  (Crosscl. 4)  Pivot Point contends that it is entitled to summary judgment because there was no fiduciary relationship between the parties and because the Chapmans' factual assertions regarding breach of the alleged fiduciary duty are unfounded.  (Pivot Mot., Dkt. No. 156, 22)  The Court concludes that there are triable issues of material fact as to the existence and source of the fiduciary duty, if any, that Krutonog and Pivot owed to the Chapmans.  Because the resolution of these factual disputes is a prerequisite to the determination of breach of fiduciary duty, the Court denies Pivot Points Motion for Summary Judgment against the Chapmans on these two claims.

Underlying this dispute is a question of fact:  what document or conduct defines the relationship between the Chapmans and Krutonog/Pivot Point and could be the source of a fiduciary duty?  There is an additional wrinkle involved in addressing this question because the law to apply will depend, at least in part, on the source of the duty.[22]  Regardless, under any relevant law, the Court must first determine that there was a fiduciary relationship between the parties.  *See Zepeda v. OneWest Bank FSB*, No. 5: CV 11-00777, 2011 WL 6182951, at *6 (N.D. Cal. Dec. 13, 2011) (first element of breach of fiduciary duty is establishing that there was a fiduciary relationship); *Kottler v. Deutsche Bank AG,* 607 F. Supp. 2d 447, 465 (S.D.N.Y. 2009) (same).  Additionally, and again regardless of the law that applies, the determination of whether a fiduciary duty exists is a question of fact that will depend on the circumstances in each case.

---

[22] For instance, if the duty arises from the Life Story Option Agreement, it would be governed by California Law, (Pivot Ex. 1 ¶ 12), whereas if it arises from the Agreement, it would be governed by New York Law.  (Pivot Ex. 7 ¶ 10; Pivot Ex. 19 ¶ 9)

*Bear Stearns & Co. v. Daisy Sys. Corp.*, 97 F.3d 1171, 1178 (9th Cir.1996) ("[E]xistence of a fiduciary relation is a question of fact which properly should be resolved by looking at the particular facts and circumstances of the relationship at issue."); *Kottler*, 607 F. Supp. 2d at 465 (quoting *Facella v. Fed'n of Jewish Philanthropies of N.Y., Inc.,* No. 98 Civ. 3146, 2004 WL 1700616, at *6 (S.D.N.Y. July 30, 2004) ("In determining when a fiduciary relationship exists, 'New York courts conduct a fact-specific inquiry into whether a party reposed confidence in another and reasonably relied on the other's superior expertise or knowledge.'")).

　　　As the Supreme Court has noted, it is "clear that on a summary judgment motion a court's only role is to determine if a genuine issue of fact exists:  it cannot assume the role of the jury on a sensitive factual issue like fiduciary duty." *Anderson,* 477 U.S. at 249.  While the parties dispute what in their relationship and course of dealings could give rise to a fiduciary duty, it is possible that Krutonog/Pivot owed the Chapmans a fiduciary duty:  (1) pursuant to the Life Rights Option Agreement; (2) because the Chapmans were an intended third-party beneficiary under the Agreement between Pivot Point and Plaintiffs; (3) pursuant to an oral agreement between Krutonog and the Chapmans; (4) as a result of their talent/manager relationship under Section 1700 of the California Labor Code; or (5) as a result of their course of dealings.  *C.f. Anwar v. Fairfield Greenwich Ltd*., 728 F. Supp. 2d 372, 447 (S.D.N.Y. 2010) ("'Contractual relations or formal writings are not required to establish a fiduciary duty[,] . . . [r]ather, the ongoing conduct between the parties must be considered.'"  (quoting *Pension Committee of the Univ. of Montreal Pension Plan v. Banc of Am. Secs., LLC*, 446 F. Supp. 2d. 163, 196 (S.D.N.Y. 2006))).  Here, summary judgment would be inappropriate if a reasonably jury could conclude that even one of these possibilities gave rise to a fiduciary duty, and the question of breach will depend on what, if any, duty is owed.  Viewing the record in the

light most favorable to the Chapmans and granting them all reasonable inferences, a reasonable

jury could rule in the Chapmans favor as to any one, or all, of these possibilities based on the

Chapmans' allegations, the deposition testimony, the documentary evidence, (s*ee*, *e.g.,*

Chapmans Resp. SMF ¶¶ 7-10), and the history of the relationship between the parties (and

between the parties and the Plaintiffs).  Moreover, while Pivot Point claims that, even if there

were a duty, the Chapmans cannot show breach of any such duty, viewing the evidence in the

light most favorable to the non-moving party, these same allegations and this same evidence

would allow a reasonable jury to come to the contrary conclusion.  Accordingly, Pivot Point is

not entitled to summary judgment against the Chapmans on their claim of breach of fiduciary

duty.

> b.   <u>Contract Illegality</u>

The Chapmans' contract illegality claim also hinges on the fiduciary/agency relationship,

if any, between the Chapmans and Krutonog and Pivot.  The Chapmans argue that the

Agreement is illegal because Krutonog (and thereafter Pivot Point) was acting as an unlicensed

talent agent, in violation of the California Labor Code, and that under that Code they are entitled

to any gains that Krutonog/Pivot Point derived from this illegal representation.  (Chapman Opp'n

17-18).  Underlying this theory is a mixed question of law and fact:  (1) is the parties'

relationship governed by Section 1700 of the California Labor Code, and (2) if so, does this

Court have jurisdiction to apply the Code?

The second question is one on which there is disagreement within this district.  *Compare*

*Tramposch v. Winter*, No. 10 Civ. 8286, 2011 WL 2039700, at *1-2 (S.D.N.Y. May 25, 2011)

(finding that there was no basis for abstention where defendants moved to stay the proceedings

pending the Labor Commissioner's resolution of their Section 1700 claim), *with Webb v. Robert*

*Lewis Rosen Assocs., Ltd.*, No. 03 Civ. 4275, 2003 WL 23018792, at *6, n.8 (S.D.N.Y. Dec. 23, 2003) (plaintiff alleged breach of fiduciary duty by virtue of violation Section 1700 of the California Labor Code; court held that "[t]o the extent that [plaintiff's] breach of fiduciary obligation claim . . . rest[s] on such violation, [it is] not actionable and must be dismissed because this Court does not have jurisdiction under these statues;" "any claim brought pursuant to . . . Section 1700 must be asserted in the proper administrative forum[]").  Under the facts of this case, the jurisdictional question is only relevant if, in resolving the factual dispute in the previous section, the fact-finder determines that the relationship between the Chapmans and Krutonog/Pivot Point falls within the California Labor Code.  If the relationship is not governed by the Code, the Court would not need to address this legal question or the district disagreement. In light of this uncertainty, the Court will not address this issue until such time as it is squarely before the Court,[23] and Pivot's motion for summary judgment on this claim is denied.

  c. Breach of the Agreement

    Finally, Pivot Point argues that it is entitled to summary judgment against the Chapmans on their claim of breach of the Agreement between Plaintiffs and Pivot Point.  Because the Chapmans are neither a party to the Agreement nor in privity with a party to it, the survival of their claim at this point depends on whether there is a genuine issue of material fact regarding whether they were an intended third-party beneficiary of the Agreement.  The Court determines that there are triable questions of fact on this point and Pivot Point's motion for summary judgment on this claim must be denied.

    Pivot Point argues that the parties to the Agreement did not intend to confer a benefit to the Chapmans, that the Court must constrain itself to the four-corners of the Agreement in

---

[23] For this same reason, and in light of the ongoing appeals, the Court does not now address the parties' submissions with regard to the effect on the current action, if any, of the California Labor Commission decision.

determining whether the Chapmans were intended beneficiaries, and that the Agreement unambiguously shows that the Chapmans were not intended third-party beneficiaries.  (Pivot Mot., Dkt. No. 157, ¶ 18-20)  The Chapmans argue that they were third-party beneficiaries of the Agreement "by virtue of the fact that Plaintiffs were paying Pivot Point and Krutonog to render services as the Chapmans' manager in connection with the [Dog the Bounty Hunter television] Program."  (Chapman Opp'n 20)  They argue that the language of the Agreement unambiguously confers a third-party benefit to them as evidenced by the fact that the only "co-executive producer service" that Krutonog/Pivot Point could offer was to manage the Chapmans' relationship with Plaintiffs.  (Chapman Opp'n 21)  The alleged benefit to the Chapmans, then, was that Plaintiffs paid to Krutonog/Pivot Point money that the Chapmans would otherwise have had to pay to Krutonog in exchange for his managerial services.  (Chapman Opp'n 21-22)

The Chapmans' claim is based on, and requires interpretation of, the Agreement and is therefore governed by New York law.  *See supra* Section II.b.   "New York law follows the Restatement (Second) of Contracts § 302 (1979) in allowing a third party to enforce a contract if that third party is an intended beneficiary of the contract."  *Flickinger v. Harold C. Brown & Co.*, 947 F.2d 595, 600 (2d Cir. 1991) (citing *Fourth Ocean Putnam Corp. v. Interstate Wrecking Co.*, 485 N.E.2d 208, 212 (1985)).  "A party asserting rights as a third-party beneficiary must establish '(1) the existence of a valid and binding contract between other parties,[24] (2) that the contract was intended for his benefit and (3) that the benefit to him is sufficiently immediate, rather than incidental, to indicate the assumption by the contracting parties of a duty to compensate him if the benefit is lost.'"  *State of Cal. Pub. Emps.' Ret. Sys. v. Shearman & Sterling*, 95 N.Y. 2d 427, 434-35, 718 N.Y.S2d 256 (N.Y. 2000).  As a general rule, "[i]ssues of

---

[24] Pivot argues that the Chapmans claim fails because one of their counterclaims is that the Agreement itself is illegal, which, if true, would mean that the Chapmans could not establish the existence of a valid and binding contract.  This argument lacks merit:  the Chapmans may argue in the alternative.

intent are questions of fact and, as such, the Second Circuit has explained that summary

judgment should be used sparingly." *Agence France Presse v. Morel*, -- F. Supp. 2d --, 2013

WL 166035, at *7 (citing *Redd v. N.Y. State Div. of Parole,* 678 F.3d 166, 178 (2d Cir. 2012)).

There is some dispute under New York law regarding the scope of a Court's review in

determining whether an entity is an intended third-party beneficiary.  *See Piccoli A/S v. Calvin*

*Klein Jeanswear Co.*, 19 F. Supp. 2d 157, 164 (S.D.N.Y. 1998) ("There is considerable dispute

concerning whether it is appropriate to consider extrinsic evidence" in determining third-party

beneficiary status); *see also* 28 N.Y. Prac., Contract Law § 8:6 (Banks, 2013) (discussing this

dispute).  While some courts have held that a reviewing court may look to extrinsic evidence, *In*

*re Gulf Oil/Cities Serv. Tender Offer Litig.,* 725 F. Supp. 712, 733 (S.D.N.Y.1989) ("Although a

third party need not be specifically mentioned in the contact [sic] before third-party beneficiary

status is found, New York law requires that the parties' intent to benefit a third party must be

shown on the face of the agreement."), the more prevalent view is that the Court is limited to

review of the face of the contract.  *See Debary v. Harrah's Operating Co., Inc.*, 465 F. Supp. 2d

250, 263 (S.D.N.Y. 2006) ("The terms contained in the contract must clearly evince an intention

to benefit the third person who seeks the protection of the contractual provisions.").  In this case,

whether constrained to the face of the contract or viewed in conjunction with the extrinsic

evidence, the Agreement is ambiguous as to the Chapmans' status as a third-party beneficiary.

Accordingly, the Court need not determine the proper scope of its review:  summary judgment is

inappropriate, regardless, as a reasonable jury could return a verdict for the Chapmans.

The language at issue is ambiguous.  The contract provides that Krutonog (and later

Pivot) was to provide "co-executive producer services," in exchange for significant, ongoing

payment from Plaintiffs.  (Pivot Ex. 7)  The phrase "co-executive producer services" does not,

however, provide any indication as to what Krutonog's obligations were as a result of entering into the COEP, and there is no further discussion in the COEP or the amendments regarding his actual obligations.  There is also no indication that this "is a term of art or that it carries a specific meaning in the industry."  *Tom Doherty Assocs. Inc. v. Saban Entm't Inc.*, 869 F. Supp. 1130, 1138 (S.D.N.Y. 1994).  In light of this ambiguity, and drawing all reasonable inferences in the Chapmans' favor, the Court cannot conclude as a matter of law from the face of the contract that the Chapmans are not the intended third-party beneficiary of the Agreement.

Reference to the extrinsic evidence, likewise, does not allow for summary judgment.  The extrinsic evidence shows that Krutonog's management of the Chapmans was "of the essence" to Plaintiffs and that his "services" under the contract were to "wrangle the talent."  In the light most favorable to the Chapmans, a reasonable juror could conclude that Plaintiffs had entered into the Agreement with Krutonog (and later Pivot) both for their own benefit and for the benefit of the Chapmans.  Specifically, it is reasonable to infer that the services Krutonog (and later Pivot) was providing were services that the Chapmans would have had to pay for out of their own pocket had Plaintiffs not chosen to enter into the Agreement.

In the light most favorable to the Chapmans, there is an issue of material fact as to intended third-party beneficiary status, and a jury looking either to the language of the Agreement or to that language in addition to the extrinsic evidence could reasonably conclude that they were the intended third-party beneficiaries.  Accordingly, there is a genuine issue of material fact, *see Ramos*, 587 F.3d at 558, and Pivot Point is not entitled to summary judgment on this claim.

     d.  <u>The Interpleaded Funds</u>

The Court concludes that Pivot Point is not entitled to summary judgment on any of the Chapmans' claims. Because the resolution of these claims could result in the Chapmans being entitled to full disbursement of any money due to Pivot Point under the Agreement, the Court's decision does not entitle either party to recover any portion of the interpleaded funds at this juncture.

## VI. CONCLUSION

For the reasons discussed herein, THE COURT ORDERS that: Plaintiffs' Motion for Summary Judgment is GRANTED in part and DENIED in part; Pivot Point's Motion for Summary Judgment against Plaintiffs is GRANTED in part and DENIED in part; and Pivot Point's Motion for Summary Judgment against the Chapmans is DENIED.

THE COURT FURTHER ORDERS that a conference in this matter will be held on April 4, 2013, at 11:00 AM in Courtroom 906 of the United States District Court for the Southern District of New York, Thurgood Marshall U.S. Courthouse at 40 Foley Square, New York, New York.

THE COURT FINALLY ORDERS that, pursuant to Rule 5A of this Court's Individual Rules in Civil Cases, the parties' shall submit to the Court their proposed joint pretrial order within fourteen days of this decision.

SO ORDERED.

Dated: March __27__, 2013
New York, New York

_____
ALISON J. NATHAN
United States District Judge